## SCARBOROUGH *v.* UNITED STATES

No. 75–1344.  Argued March 2, 1977—Decided June 6, 1977

*Philip J. Hirschkop* argued the cause and filed a brief for petitioner.

*Richard A. Allen* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Thornburgh,* and *Sidney M. Glazer.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Petitioner was convicted of possessing a firearm in violation of Title VII of the Omnibus Crime Control and Safe Streets

Act of 1968 (Omnibus Crime Control Act), 18 U. S. C. App. §§ 1201–1203. The statute provides, in pertinent part:

> "Any person who—
>
> "(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony . . .
>
> .     .     .     .     .
>
> "and who receives, possesses, or transports in commerce or affecting commerce . . . any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both." 18 U. S. C. App. § 1202 (a).[1]

The issue in this case is whether proof that the possessed firearm previously traveled in interstate commerce is sufficient to satisfy the statutorily required nexus between the possession of a firearm by a convicted felon and commerce.

## I

In 1972 petitioner pleaded guilty in the Circuit Court of Fairfax County, Va., to the felony of possession of narcotics with intent to distribute. A year later, in August 1973, law

---

[1] Section 1202 (a) reads in full:

"(a) Any person who—

"(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, or

"(2) has been discharged from the Armed Forces under dishonorable conditions, or

"(3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or

"(4) having been a citizen of the United States has renounced his citizenship, or

"(5) being an alien is illegally or unlawfully in the United States,

"who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both."

enforcement officials, in the execution of a search warrant for narcotics, seized four firearms from petitioner's bedroom. Petitioner was subsequently charged with both receipt and possession of the four firearms in violation of 18 U. S. C. App. § 1202 (a)(1).

In a jury trial in the Eastern District of Virginia, the Government offered evidence to show that all of the seized weapons had traveled in interstate commerce. All the dates established for such interstate travel were prior to the date petitioner became a convicted felon.[2] The Government made no attempt to prove that the petitioner acquired these weapons after his conviction.[3] Holding such proof necessary for a receipt conviction, the judge, at the close of the Government's case, granted petitioner's motion for a judgment of acquittal on that part of the indictment charging receipt.

Petitioner's defense to the possession charge was twofold. As a matter of fact, he contended that by the time of his conviction he no longer possessed the firearms. His claim was that, to avoid violating this statute, he had transferred these guns to his wife prior to pleading guilty to the narcotics felony. Secondly, he argued that, as a matter of law, proof that the

---

[2] The Government's evidence showed that the Colt revolver was shipped from Connecticut to North Carolina in 1969 and entered Virginia by unknown means, App. 6–7; that the Universal Enforcer came from Florida to Virginia in 1969 and was purchased by petitioner in 1970, id., at 7–8; that the M–1 carbine rifle was sent to Maryland from Illinois in 1966, coming to Virginia by unknown means, id., at 8–9; and that the St. Etienne Ordinance revolver was manufactured in France in the 19th century and was somehow later brought into Virginia, id., at 9–10.

[3] The Government showed that petitioner bought the Enforcer in 1970. The only evidence regarding acquisition of the other weapons came from petitioner. He claimed he purchased the Colt revolver in 1970, Tr. 88, and the M–1 rifle in 1968, id., at 108. The French revolver, he claimed, was left in his house shortly before the state conviction but he was not sure by whom. Id., at 88, 105.

guns had at some time traveled in interstate commerce did not provide an adequate nexus between the possession and commerce. In furtherance of this defense, petitioner requested that the jury be instructed as follows:

> "In order for the defendant to be found guilty of the crime with which he is charged, it is incumbent upon the Government to demonstrate a nexus between the 'possession' of the firearms and interstate commerce. For example, a person 'possesses' in commerce or affecting commerce if at the time of the offense the firearms were moving interstate or on an interstate facility, or if the 'possession' affected commerce. It is not enough that the Government merely show that the firearms at some time had travelled in interstate commerce. . . ." App. 12–13.

The judge rejected this instruction. Instead he informed the jury:

> "The government may meet its burden of proving a connection between commerce and the possession of a firearm by a convicted felon if it is demonstrated that the firearm possessed by a convicted felon had previously travelled in interstate commerce.
>
> .    .    .    .    .
>
> "It is not necessary that the government prove that the defendant purchased the gun in some state other than that where he was found with it or that he carried it across the state line, nor must the government prove who did purchase the gun." *Id.*, at 14.

Petitioner was found guilty and he appealed. The Court of Appeals for the Fourth Circuit affirmed. 539 F. 2d 331. It held that the interstate commerce nexus requirement of the possession offense was satisfied by proof that the firearm petitioner possessed had previously traveled in interstate com-

merce. In view of the split among the Circuits on this issue,[4] we granted certiorari. 429 U. S. 815 (1976).[5] We affirm.

## II

Our first encounter with Title VII of the Omnibus Crime Control Act came in *United States* v. *Bass,* 404 U. S. 336 (1971). There we had to decide whether the statutory phrase "in commerce or affecting commerce" in § 1202 (a) applied to "possesses" and "receives" as well as to "transports." We noted that the statute was not a model of clarity. On the one hand, we found "significant support" in the legislative history for the contention that the statute "reaches the mere possession of guns without any showing of an interstate commerce nexus" in individual cases. 404 U. S., at 345–346. On the other hand, we could not ignore Congress' inserting the phrase "in commerce or affecting commerce" in the statute. *Id.,* at 345. The phrase clearly modified "trans-

---

[4] Agreeing with the Fourth Circuit that proof of previous interstate movement of the firearm provides a sufficient commerce nexus for the possession offense are the Sixth Circuit, *United States* v. *Jones,* 533 F. 2d 1387 (1976), and the Tenth Circuit, *United States* v. *Bumphus,* 508 F. 2d 1405 (1975) (dictum). Three other Circuits have indicated that .such proof is adequate for a receipt offense but that the possession offense requires that the possession have a contemporaneous nexus with commerce. *United States* v. *Ressler,* 536 F. 2d 208 (CA7 1976); *United States* v. *Bell,* 524 F. 2d 202 (CA2 1975); *United States* v. *Steeves,* 525 F. 2d 33 (CA8 1975) (dictum). The Ninth Circuit apparently has an intra-Circuit conflict. Compare *United States* v. *Malone,* 538 F. 2d 250 (1976), and *United States* v. *Cassity,* 509 F. 2d 682 (1974), with *United States* v. *Burns,* 529 F. 2d 114 (1975).

[5] The grant of the petition was limited to the question "[w]hether the Court erred in holding that a conviction under 18 U. S. C. App. § 1202 (a) for possession of a firearm in commerce or affecting commerce by a convicted felon is sustainable merely upon a showing that the possessed firearm has previously at any time however remote travelled in interstate commerce." Petitioner's Fourth Amendment claim was excluded.

port" and we could find no sensible explanation for requiring a nexus only for transport. *Id.,* at 340. Faced with this ambiguity,[6] the Court adopted the narrower reading that the phrase modified all three offenses. We found this result dictated by two principles of statutory interpretation: First, that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Rewis* v. *United States,* 401 U. S. 808, 812 (1971), and second, that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance," *Bass, supra,* at 349. Since "[a]bsent proof of some interstate commerce nexus in each case § 1202 (a) dramatically intrudes upon traditional state criminal jurisdiction," 404 U. S., at 350, we were unwilling to conclude, without a "clearer statement of intention," *ibid.,* that Congress meant to dispense entirely with a nexus requirement in individual cases.

It was unnecessary in *Bass* for us to decide what would constitute an adequate nexus with commerce as the Government had made no attempt to show any nexus at all. While we did suggest some possibilities,[7] the present case presents the first opportunity to focus on the question with the benefit of full briefing and argument.

The Government's position is that to establish a nexus with interstate commerce it need prove only that the firearm possessed by the convicted felon traveled at some time in interstate commerce. The petitioner contends, however, that the nexus must be "contemporaneous" with the possession, that the statute proscribes "only crimes with a present connection to commerce." Brief for Petitioner 9. He suggests that at the time of the offense the possessor must be engaging

---

[6] As one commentator described our dilemma: "[T]he legislative history looked one way and the logic and structure of the statute another, while the language was not clear." Stern, The Commerce Clause Revisited— The Federalization of Intrastate Crime, 15 Ariz. L. Rev. 271, 281 (1973).

[7] See n. 11, *infra.*

in commerce or must be carrying the gun at an interstate facility. Tr. of Oral Arg. 11. At oral argument he suggested an alternative theory—that one can be convicted for possession without any proof of a present connection with commerce so long as the firearm was acquired after conviction. *Id.,* at 15.

In our effort to resolve the dispute, we turn first to the text of the statute. Petitioner contends that the meaning can be readily determined from the face of the statute, at least when it is contrasted with Title IV of the Omnibus Crime Control Act, another title dealing with gun control.[8] He points to one section of Title IV, 18 U. S. C. § 922 (h), arguing, in reliance on our decision in *Barrett* v. *United States,* 423 U. S. 212 (1976), that this section shows how Congress can, if it chooses, specify an offense based on firearms that have previously traveled in commerce. In § 922 (h), Congress employed the present perfect tense, as it prohibited a convicted felon from receiving a firearm "which has been shipped or transported in interstate or foreign commerce." This choice of tense led us to conclude in *Barrett* that Congress clearly "denot[ed] an act that has been completed." 423 U. S., at 216. Thus, petitioner argues, since Congress knows how to specify completed transactions, its failure to use that language in the present statute must mean that it wanted to reach only ongoing transactions.

The essential difficulty with this argument is that it is not very meaningful to compare Title VII with Title IV. See *Bass,* 404 U. S., at 344. Title VII was a last-minute amendment to the Omnibus Crime Control Act enacted hastily with little discussion and no hearings.[9] The statute, as we noted in

---

[8] The provisions of Title IV of the Omnibus Crime Control Act were re-enacted later that year without relevant change in the Gun Control Act of 1968, 82 Stat. 1213. For convenience, those provisions are referred to here collectively as Title IV.

[9] Senator Long introduced it on the floor of the Senate on May 17, 1968. About a week later he explained his amendment again; there was

*Bass,* is not the product of model legislative deliberation or draftsmanship. *Id.,* at 339, 344. Title IV, on the other hand, is a carefully constructed package of gun control legislation. It is obvious that the tenses used throughout Title IV were chosen with care. For example, in addition to the prohibition in § 922 (h) on receipt by convicted felons, Congress also made it illegal in § 922 (g) for such person to "ship or transport any firearm or ammunition in interstate or foreign commerce." In § 922 (j), Congress made it unlawful for "any person to receive, conceal, store, barter, sell or dispose of any stolen firearm . . . , which is moving as, which is part of, or which constitutes, interstate or foreign commerce." And § 922 (k) makes it illegal for "any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had [its] serial number removed, obliterated or altered." In view of such fine nuances in the tenses employed in the statute, the Court could easily conclude in *Barrett* that "Congress knew the significance and meaning of the language it employed." 423 U. S., at 217. The language it chose was "without ambiguity." *Id.,* at 216. "Had Congress intended to confine § 922 (h) to direct interstate receipts, it would have so provided, just as it did in other sections of [Title IV]." *Id.,* at 217.

In the present case, by contrast, Congress' choice of language was ambiguous at best. While it is true that Congress did not choose the precise language used in § 922 (h) to indicate that a present nexus with commerce is not required, neither did it use the language of § 922 (j) to indicate that the gun must have a contemporaneous connection with commerce at the time of the offense. Thus, while petitioner is correct

brief debate; a vote was called; and the amendment was agreed to without having been referred to any committee. Accordingly, there were no legislative hearings and no committee reports. The amendment received only passing mention in the House discussion of the bill and never received committee consideration there either.

in noting that Congress has the skills to be precise, the fact that it did not employ those skills here helps us not at all.

While Congress' choice of tenses is not very revealing, its findings and its inclusion of the phrase "affecting commerce" are somewhat more helpful. In the findings at the beginning of Title VII, Congress expressly declared that "the receipt, possession, or transportation of a firearm by felons . . . constitutes . . . a burden on commerce or threat affecting the free flow of commerce," 18 U. S. C. App. § 1201 (1).[10] It then implemented those findings by prohibiting possessions "in commerce and affecting commerce." As we have previously observed, Congress is aware of the "distinction between legislation limited to activities 'in commerce' and an assertion of its full Commerce Clause power so as to cover all activity substantially affecting interstate commerce." *United States* v. *American Bldg. Maintenance Industries,* 422 U. S. 271, 280 (1975); see also *NLRB* v. *Reliance Fuel Corp.,* 371 U. S. 224, 226 (1963). Indeed, that awareness was explicitly demonstrated here. In arguing that Congress could,

---

[10] Title 18 U. S. C. App. § 1201 reads in its entirety:

"Congressional findings and declaration.

"The Congress hereby finds and declares that the receipt, possession, or transportation of a firearm by felons, veterans who are discharged under dishonorable conditions, mental incompetents, aliens who are illegally in the country, and former citizens who have renounced their citizenship, constitutes—

"(1) a burden on commerce or threat affecting the free flow of commerce,

"(2) a threat to the safety of the President of the United States and Vice President of the United States,

"(3) an impediment or a threat to the exercise of free speech and the free exercise of a religion guaranteed by the first amendment to the Constitution of the United States, and

"(4) a threat to the continued and effective operation of the Government of the United States and of the government of each State guaranteed by article IV of the Constitution."

consistent with the Constitution, "outlaw the mere possession of weapons," Senator Long, in introducing Title VII, pointed to the fact that "many of the items and transactions reached by the broad swath of the Civil Rights Act of 1964 were reached by virtue of the power of Congress to regulate matters affecting commerce, not just to regulate interstate commerce itself." 114 Cong. Rec. 13868 (1968). He advised a similar reliance on the power to regulate matters affecting commerce and urged that "Congress simply [find] that the possession of these weapons by the wrong kind of people is either a burden on commerce or a threat that affects the free flow of commerce." *Id.,* at 13869. While in *Bass* we noted that we could not be sure that Congress meant to do away entirely with a nexus requirement, it does seem apparent that in implementing these findings by prohibiting both possessions in commerce and those affecting commerce, Congress must have meant more than to outlaw simply those possessions that occur in commerce or in interstate facilities. And we see no basis for contending that a weapon acquired after a conviction affects commerce differently from one acquired before and retained.

The legislative history in its entirety, while brief, further supports the view that Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that "they may not be trusted to possess a firearm without becoming a threat to society." *Id.,* at 14773. There is simply no indication of any concern with either the movement of the gun or the possessor or with the time of acquisition.

In introducing the amendment, Senator Long stated:

> "I have prepared an amendment which I will offer at an appropriate time, simply setting forth the fact that anybody who has been convicted of a felony . . . is not permitted to possess a firearm . . . .
>
> "It might be well to analyze, for a moment, the logic involved. When a man has been convicted of a felony,

unless—as this bill sets forth—he has been expressly pardoned by the President and the pardon states that the person is to be permitted to possess firearms in the future, that man would have no right to possess firearms. He would be punished criminally if he is found in possession of them.

.        .        .        .        .

"It seems to me that this simply strikes at the possession of firearms by the wrong kind of people. It avoids the problem of imposing on an honest hardware store owner the burden of keeping a lot of records and trying to keep up with the ultimate disposition of weapons sold. It places the burden and the punishment on the kind of people who have no business possessing firearms in the event they come into possession of them." *Id.,* at 13868–13869.

The purpose of the amendment was to complement Title IV. *Id.,* at 14774; see also *id.,* at 16286. Senator Long noted:

"Of all the gun bills that have been suggested, debated, discussed and considered, none except this Title VII attempts to bar possession of a firearm from persons whose prior behaviors have established their violent tendencies. . . .

". . . Under Title VII, every citizen could possess a gun until the commission of his first felony. Upon his conviction, however, Title VII would deny every assassin, murderer, thief and burglar of [*sic*] the right to possess a firearm in the future . . . .

.        .        .        .        .

"Despite all that has been said about the need for controlling firearms in this Country, no other amendment heretofore offered would get at the Oswalds or the Galts. They are the types of people at which Title VII is aimed." *Id.,* at 14773–14774.

He proposed this amendment to remedy what he thought was an erroneous conception of the drafters of Title IV that there was "a constitutional doubt that the Federal Government could outlaw the mere possession of weapons." *Id.*, at 13868.

The intent to outlaw possession without regard to movement and to apply it to a case such as petitioner's could not have been more clearly revealed than in a colloquy between Senators Long and McClellan:

> "Mr. McClellan. I have not had an opportunity to study the amendment. . . . The thought that occurred to me, as the Senator explained it, is that if a man had been in the penitentiary, had been a felon, and had been pardoned, without any condition in his pardon to which the able Senator referred, granting him the right to bear arms, could that man own a shotgun for the purpose of hunting?
>
> "Mr. Long of Louisiana. No, he could not. He could own it, but he could not possess it.
>
> "Mr. McClellan. I beg the Senator's pardon?
>
> "Mr. Long of Louisiana. This amendment does not seek to do anything about who owns a firearm. He could not carry it around; he could not have it.
>
> "Mr. McClellan. *Could he have it in his home?*
>
> "Mr. Long of Louisiana. *No, he could not." Id.*, at 14774 (emphasis added).

It was after this colloquy that Senator McClellan suggested that the amendment be taken to conference for "further thought." *Ibid.* While that appeared to be its destination, the House, after Senate passage of the bill, defeated a motion to go to conference and adopted the entire Senate bill, including Title VII, without alteration. *Id.*, at 16077–16078, 16299–16300. Title VII thus became law without modification.

It seems apparent from the foregoing that the purpose of Title VII was to proscribe mere possession but that there was some concern about the constitutionality of such a statute. It was that observed ambivalence that made us unwilling in *Bass* to find the clear intent necessary to conclude that Congress meant to dispense with a nexus requirement entirely. However, we see no indication that Congress intended to require any more than the minimal nexus that the firearm have been, at some time, in interstate commerce.[11] In particular, we find no support for petitioner's theories.

Initially, we note our difficulty in fully comprehending petitioner's conception of a nexus with commerce. In his view, if an individual purchases a gun before his conviction, the fact that the gun once traveled in commerce does not provide an adequate nexus. It is necessary, in addition, that the person also carry it in an interstate facility. If, however, one purchases the same gun from the same dealer one day after the conviction as opposed to one day before, somehow the nexus magically appears, regardless of whether the purchaser carries the gun in any particular place. Such an interpretation strains credulity. We find no evidence in either the language or the legislative history for such a construction.[12]

---

[11] In *Bass*, the Court suggested that there might be a distinction between receipt and possession and that possession might require a stricter nexus with commerce. While such a requirement would make sense, see *United States* v. *Bell*, 524 F. 2d, at 209, further consideration has persuaded us that that was not the choice Congress made. Congress was not particularly concerned with the impact on commerce except as a means to insure the constitutionality of Title VII. State gun control laws were found "inadequate to bar possession of firearms from those most likely to use them for unlawful purposes" and Congress sought to buttress the States' efforts. 114 Cong. Rec. 14774 (1968). All indications are that Congress meant to reach possessions broadly.

[12] The argument sounds more like an effort to define possession, but the only issue before us is the nexus requirement. Petitioner has raised no objections to the trial court's definition of possession. Even as a pro-

More significantly, these theories create serious loopholes in the congressional plan to "make it unlawful for a firearm . . . to be in the possession of a convicted felon." 114 Cong. Rec. 14773 (1968). A person who obtained a firearm prior to his conviction can retain it forever so long as he is not caught with it in an interstate facility. Indeed, petitioner's interpretation allows an individual to go out in the period between his arrest and conviction and purchase and stockpile weapons with impunity. In addition, petitioner's theories would significantly impede enforcement efforts. Those who do acquire guns after their conviction obviously do so surreptitiously and, as petitioner concedes, Tr. of Oral Arg. 19, it is very difficult as a practical matter to prove that such possession began after the possessor's felony conviction.

Petitioner responds that the Government's reading of the statute fails to give effect to all three terms of the statute—receive, possess, transport. He argues that someone guilty of receipt or transport will necessarily be guilty of possession and that, therefore, there was no need to include the other two offenses in the statute. While this contention is not frivolous,[13] the fact is that petitioner's theory is similarly vulnerable. By his proposed definitions, there are essentially only two crimes—receipt and transport. The possessor who acquires the weapon after his conviction is guilty of receipt and the one who is carrying the gun in commerce or at an inter-

---

posed definition of possession, however, there is no support for it in the history or text. While Senator Long used the word "acquire" a few times in discussing the amendment, it is clear his concern was with the dangers of certain people having guns, not with when they obtained them. Furthermore, his use of the term "acquire" is better explained as a synonym for "receive" than for "possess." See *United States* v. *Kelly*, 519 F. 2d 251, 253 n. 3 (CA8 1975).

[13] We note, however, that it is also arguable that one could receive and perhaps transport a weapon without necessarily exercising dominion and control over it.

state facility presumably is guilty of transporting.[14]   Thus, the definitions offered by both sides fail to give real substance to all three terms.   The difference, however, is that the Government's definition captures the essence of Congress' intent, striking at the possession of weapons by people "who have no business possessing [them]."   114 Cong. Rec. 13869 (1968). Petitioner's version, on the other hand, fails completely to fulfill the congressional purpose.   It virtually eliminates the one offense on which Congress focused in enacting the law.

Finally, petitioner seeks to invoke the two principles of statutory construction relied on in *Bass*—lenity in construing criminal statutes and caution where the federal-state balance is implicated.   Petitioner, however, overlooks the fact that we did not turn to these guides in *Bass* until we had concluded that "[a]fter 'seizing every thing from which aid can be derived,' . . . we are left with an ambiguous statute."   404 U. S., at 347.   The principles are applicable only when we are uncertain about the statute's meaning and are not to be used "in complete disregard of the purpose of the legislature." *United States* v. *Bramblett,* 348 U. S. 503, 510 (1955).   Here, the intent of Congress is clear.   We do not face the conflicting pull between the text and the history that confronted us in *Bass.*   In this case, the history is unambiguous and the text consistent with it.   Congress sought to reach possessions broadly, with little concern for when the nexus with commerce occurred.   Indeed, it was a close question in *Bass* whether § 1202 (a) even required proof of any nexus at all in individual cases.   The only reason we concluded it did was because it was not "plainly and unmistakably" clear that it did not.   404 U. S., at 348.   But there is no question that Congress intended no more than a minimal nexus requirement.

---

[14] Petitioner suggests that a possessor's simply waiting in an interstate facility is not transporting.   Even if that is true, we find it inconceivable, in view of the legislative history, that Congress intended the possession offense to have so limited a scope.

Since the District Court and the Court of Appeals employed the proper standard, we affirm the conviction of petitioner.

*It is so ordered.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, dissenting.

So far as the record reflects, the petitioner in this case acquired the four weapons in question before he was convicted of a felony in August 1972. Until that time, his possession of the guns was entirely legal under federal law. Under the Court's construction of 18 U. S. C. App. § 1202 (a)(1), however, the petitioner was automatically guilty of a serious federal criminal offense at the moment he was convicted in the state felony case. This result is in my view inconsistent with the time-honored rule of lenity in construing federal criminal statutes. See, *e. g., Rewis* v. *United States,* 401 U. S. 808, 812; *Ladner* v. *United States,* 358 U. S. 169, 177–178; *Bell* v. *United States,* 349 U. S. 81, 83; *United States* v. *Universal C. I. T. Credit Corp.,* 344 U. S. 218, 221–222. I would hold that § 1202 (a)(1) does not come into play unless and until a person first comes into possession of a firearm *after* he is convicted of a felony.

The language of § 1202 (a)(1) does not compel the construction that the Court adopts. The statute covers "[a]ny person who . . . has been convicted . . . of a felony . . . and who receives, possesses, or transports . . . any firearm . . . ." Plainly the acts of receiving and transporting are prohibited only if they occur after the defendant's conviction. The language does not indicate, however, whether the illegal possession must also first begin after conviction, or whether a prior possession becomes illegal at the moment the possessor is adjudged guilty of a felony. And, as the Court observes, *ante,* at 576–577, any reading of the statute makes

one or another part of it redundant. If § 1202 (a) makes criminal any postconviction possession of a gun by a convicted felon, then there will almost never be a situation where the Government would need to rely on the prohibition against receipt of the gun, for in most cases receipt would result in possession, and the latter is generally easier to prove. On the other hand, if the prohibition against possession refers to a possession that begins only after a felony conviction, the Government presumably could proceed on a receipt charge in such cases, without relying on the possession offense (or vice versa).

The legislative history does not provide much help. There are statements suggesting that Congress meant to proscribe any possession of a firearm by a convicted felon. Other statements, however, intimate that the statute's purpose was to prevent a convicted felon from *coming into possession* of a weapon after his conviction. For instance, Senator Long, the drafter and sponsor of § 1202, stated that the statute "places the burden and the punishment on the kind of people who have no business possessing firearms *in the event they come into possession of them.*" 114 Cong. Rec. 13869 (1968). Later he added that § 1202 (a) "would deny every assassin, murderer, thief and burglar . . . the right to possess a firearm *in the future . . . .*" 114 Cong. Rec. 14773.

In short, I disagree with the Court that the scope of § 1202 (a) is so crystal clear that there is no room for the operation of the rule of lenity. In my view, we are under no mandate to construe this statute so that a person in lawful possession of a firearm, and presumed to be innocent of a felony until proved guilty, must upon his conviction of a felony also be automatically and instantly guilty of a wholly different serious criminal offense.[1] The statute could equally

---

[1] Under this construction, for example, a bookkeeper who owns a hunting rifle and who later commits embezzlement will, immediately upon his embezzlement conviction, also be guilty of violating § 1202 (a). At oral argument the Government agreed that such a person should have a reason-

be read to apply only when a person first comes into possession of a firearm after his felony conviction.[2]   That being so, I would choose the latter alternative, for "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.   We should not derive criminal outlawry from some ambiguous implication."   *United States* v. *Universal C. I. T. Credit Corp., supra,* at 222.

Since the petitioner in this case came into possession of the firearms before he was convicted of any felony, I would hold that he did not violate § 1202 (a)(1).   Accordingly, I respectfully dissent from the opinion and judgment of the Court.

---

able time to relinquish possession without being automatically in violation of the statute, and suggested that prosecutorial discretion would take care of the problem.   Proper construction of a criminal statute, however, cannot depend upon the good will of those who must enforce it.

[2] Contrary to the Court's suggestion, this reading would not allow a person "to go out in the period between his arrest and conviction and purchase and stockpile weapons with impunity." *Ante,* at 576.   Title 18 U. S. C. § 922 (h) makes it unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to receive any firearm or ammunition that has been shipped or transported in interstate or foreign commerce.