**UNITED STATES of America, Plaintiff,**

v.

**Fermin REVUELTA, Defendant.**

**No. CR–99–0117 CAL.**

United States District Court, N.D. California.

June 13, 2000.

George L. Bevans, Jr., Assistant U.S. Attorney, San Francisco, CA, for plaintiff.

Peter Goodman, San Francisco, CA, for defendant.

## ORDER ON DEFENDANT'S MOTION TO DISMISS

LEGGE, District Judge.

Now before the court is defendant Fermin Revuelta's motion to dismiss counts one through three of the superseding indictment.

The superseding indictment contains five counts. The first charges that defendant was an illegal alien in possession of a gun. Counts two and three charge that defendant made false statements, regarding his alien status, in the acquisition of a gun. Defendant now seeks to dismiss those three counts, arguing that he was not an illegal alien. Defendant does not now challenge counts four and five, charging conspiracy and attempt to export firearms.

The issues have been briefed by the parties. Oral arguments were held and the motion was submitted. The court has reviewed the moving and opposing papers, supplemental briefs, the record filed in support and opposition, the parties' arguments, and the applicable authorities. For the reasons discussed below, the court denies defendant's motion to dismiss.

I

In November 1992 defendant entered the United States illegally from Mexico. Defendant married Maria de los Angeles Galvez in California on June 3, 1993. On July 29, 1993 defendant's wife filed an immigrant visa petition (INS Form I–130) claiming defendant as beneficiary. That visa petition stated that defendant had entered the United States illegally ("Entered Without Inspection" or "EWI") in November 1992. The petition noted that defendant would apply for a visa after the petition was approved.

The INS approved Mrs. Revuelta's petition on September 2, 1993 and assigned defendant a "C21 classification," specifying defendant as the spouse of a lawful permanent resident based upon a marriage of less than two years. The visa petition was assigned a priority date of July 29, 1993. The priority date would be "published" sometime thereafter. Under the regulations, defendant could not apply for an immigrant visa until the Department of State Visa Bulletin on Availability of Immigrant Visa Numbers published the date. It takes several years for the INS to publish a date if the immigrant is from an oversubscribed country such as Mexico, because Congress has limited the annual number of immigrants who can change their status. The Visa Bulletin did not publish defendant's date until April 1999.

On January 10, 1996, defendant purchased a pistol. On the ATF form that defendant filled out when he purchased this gun (the form and responses were in Spanish), he answered "No" to the question "Are you an alien illegally in the United States?" On that same date defendant purchased another pistol, and again answered on the ATF form "No" to the question "Are you an alien illegally in the United States?" These events occurred three years before defendant's priority date was published.

On April 12, 1999 the grand jury returned a three count indictment against defendant, charging him with knowing possession of a handgun as an illegal alien, in violation of 18 U.S.C. § 922(g)(5), and two counts of knowingly misrepresenting his alien status on the ATF forms, in violation of 18 U.S.C. § 922(a)(6). On July 19, 1999 the grand jury returned the present five count superseding indictment against defendant and his alleged coconspirator. The first three charges are identical to the April 12, 1999 indictment. Count four charges both defendant and a coconspirator with conspiracy to export firearms in violation of 18 U.S.C. § 371, and count five charges both defendant and a coconspirator with exporting firearms, in violation of 22 U.S.C. § 2278(b) and (c).

On April 22, 1999 defendant was taken into INS administrative custody, and was subsequently released on bond. The INS served defendant with a Notice to Appear, alleging that he was subject to removal on that date.

On May 22, 1999 defendant took the next step in obtaining lawful residency status in the United States. He filed an INS Form I–485, Application to Register Permanent Residence or Adjust Status seeking permanent resident status, based on his marriage and the then availability of an immigrant visa application. To repeat, defendant's immigration visa application became available to him in April 1999 when the INS published his priority date of July 29, 1993. Defendant's Form I–485 application has been suspended until this case is resolved.

On September 10, 1999 defendant appeared at the INS hearing. He admitted that he was not a native or citizen of the United States and that he had entered this country illegally from Mexico. He also conceded that he was removable, and indicated that Mexico would serve as his designated country. Defendant subsequently moved to terminate the INS removal proceedings; the motion was denied on March 30, 2000.

## II

Defendant makes two arguments in support of his motion to dismiss counts one through three of the superseding indictment. The arguments are based on the factual record recited above, regarding defendant's status in the United States.

Defendant's first argument is that case law compels the conclusion that he was not an "illegal alien" at the time he purchased the firearms and signed the ATF forms, and thus he did not violate 18 U.S.C. § 922(g)(5) (1999) or 18 U.S.C. § 922(a)(6) (1999). Second, defendant argues that the INS Operating Instructions also compel the conclusion that defendant was not an "illegal alien" at the time he purchased the firearms and signed the ATF forms.

For the reasons discussed below, the court disagrees. The applicable statutes and their legislative history compel the conclusion that defendant was an alien without authorization to be in the United States at the time of the acts charged, and he is thus chargeable under the relevant statutes.

## III

18 U.S.C. § 922(g)(5) forbids an alien "illegally or unlawfully in the United States" from possessing a firearm. 18 U.S.C. § 922(a)(6) provides that it is unlawful for any person to make "any false, fictitious oral or written statement" in connection with the acquisition of a firearm. Those statutes do not define when an alien is "illegally or unlawfully" in the United States. Nor are those terms defined by the Immigration and Nationality Act. That act defines only an "alien". *See* 8 U.S.C. § 1101(a)(3) (1999).

■ Defendant argues that because he had taken all of the steps required of him to secure his status as a permanent and lawful resident of this country, he was not an illegal alien at the time he purchased the firearms. Thus, he could not be charged under section 922(g)(5), and he did not make knowingly false statements in violation of section 922(a)(6).

### A

Defendant relies upon three cases to support his arguments:

In *United States v. Igbatayo*, 764 F.2d 1039, 1040 (5th Cir.1985) (per curiam), the defendant was a Nigerian national admitted to the United States in 1981 on a student non-immigrant status. That status was to continue until December 1984, and was conditioned on the requirement that he pursue a full course of study. After receiving his degree, defendant did not re-enroll as a full-time student, but remained in the United States. In February 1984, the defendant ordered a rifle from a

federally licensed firearms dealer. In connection with that purchase he completed an ATF form, and answered in the negative the question whether he was an alien "illegally in the United States." In May 1984 an immigration judge ordered defendant's deportation, as a result of his failure to maintain his student status as required by his visa. The defendant was also charged for violating 18 U.S.C. § 922(a)(6), for knowingly making a false statement on the ATF form.

The only issue that the defendant raised on appeal was whether he was an "illegal alien" prior to the date that he was actually ordered deported. That is, if he was not an illegal alien in February 1984, then he did not make a knowingly false statement on the ATF form. He argued that because he had prior authorization to be in this country, he was not "illegal", but instead was merely deportable. The court disagreed:

> This argument is not convincing. Although the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., does not define the term "illegal alien," it is clear that an alien who is in the United States without authorization is in the country illegally. After failing to maintain the student status required by his visa, Igbatayo was without authorization to remain in this country. He thus was in the same position legally as the alien who wades across the Rio Grande or otherwise enters the United States without permission.

*Id.* at 1040.

In *United States v. Hernandez*, 913 F.2d 1506, 1513 (10th Cir.1990), the defendant was convicted of violating section 922(g)(5). The defendant argued that he was not in the United States illegally, because he applied for amnesty after he had purchased the firearm. The *Hernandez* court disagreed:

> To establish that a defendant is illegally in the United States for purposes of § 922(g)(6) [sic], the government must prove that the alien was in the United States without authorization at the time the firearm was received.... Because aliens in the process of applying for legalization of their immigration status may not be deported, 8 U.S.C. §§ 1160(d) & 1255a(e), they are not unlawfully in the United States and thereby subject to prosecution under § 922(a)(6). Consequently, to be prosecuted under § 922(g)(5), an alien seeking amnesty under 8 U.S.C. § 1160 or § 1255 must either receive a firearm before filing an amnesty application or after such application is denied.

*Id.* at 1513 (citations omitted). Because the defendant had purchased the gun *before* he filed for amnesty, he was illegal at that time and thus violated the statutes.

Finally, in *United States v. Brissett,* 720 F.Supp. 90, 90 (S.D.Tex.1989), the defendant was charged with making a false statement in connection with the acquisition of a firearm. The indictment alleged that the defendant represented on the ATF form that he was not an alien illegally in the United States when he obtained the weapon. *See id.*

The defendant had entered the United States in September 1985 pursuant to a visitor's visa. The visa subsequently expired, but defendant did not depart the country. He married a United States citizen in January 1987. On April 8, 1987, the defendant and his wife filed a petition for an alien relative (Form I–130) *and* an application for adjustment of status to permanent resident (Form I–485) with the INS. *See id.* at 91. The INS denied defendant's application for adjustment of status to permanent resident on July 30, 1987, *after* he had purchased the firearm.

The court dismissed the indictment "because the defendant had an application for adjustment of status to permanent resident pending at the time he obtained the firearm, he was not an alien illegally or unlawfully in the United States." *Id.* The court reasoned that

[a]n alien applicant for adjustment of status to permanent resident is not 'without authorization' to remain in the United States, and thus is not 'illegally' or 'unlawfully' in the country within the criminal statutes invoked in this case. United States immigration regulations permit an applicant for adjustment of status to permanent resident under 8 U.S.C. § 1255 (1982 & Supp. IV 1986) to remain in the country *pending disposition of the application.* Under 8 C.F.R. § 274a.12 (1988), an alien who has filed an application for adjustment of status to permanent resident may obtain employment authorization in increments not exceeding one year while the application is pending. Under INS operations instruction 242.1a(23), an INS district director ordinarily will not institute deportation proceedings against an alien applicant for adjustment of status to permanent resident while the application is reviewed....

*Id.* (emphasis added).

For purposes of comparison with this case, the key fact in *Brissett* was that the defendant had already filed his petition for a change of status (Form I–485) *before* he purchased the firearm. Defendant in the present case had been named his wife's beneficiary in the I–130 visa petition. However, he had not yet filed an application for adjustment of status to permanent resident (Form I–485), as had the defendant in *Brissett.*

Nonetheless, defendant contends that the facts of this case are closer to the facts in *Brissett* than those in *Igbatayo.* Defendant argues that under the Adjustment Act of 1994, 8 U.S.C. § 1255(i), Pub. Law 103–317, 108 Stat. 1765, an alien who enters the United States illegally can file an application for adjustment of status without leaving the country. That much is true. However, in order to file an I–485 application, an alien must also prove his *eligibility for immediate* issuance of a visa in the form of an approved I–130 visa petition, and *show that the Priority Date*

*assigned in the I–130 petition had been published in the Visa Bulletin.* See 8 C.F.R. § 245.2(a)(2)(I) (emphasis added). Defendant concedes that he did not meet the latter requirement, but he contends that it was only a ministerial requirement that was not within his power. He argues that because he had completed all of the requirements that he could control to receive an adjustment of his status, the court should consider him as the defendant in *Brissett,* a legal resident. This argument, however, runs afoul of Ninth Circuit precedent.

In *Tongatapu Woodcraft Hawaii, Ltd. v. Feldman,* 736 F.2d 1305 (9th Cir.1984), the Ninth Circuit held that there is a substantive difference between a visa *petition* and an actual visa:

It is important to note that a visa petition is not the same thing as a visa. *An approved visa petition is merely a preliminary step in the visa application process.* 1A Gordon & Rosenfeld, Immigration Law and Procedure § 3.5(j). It does not guarantee that a visa will be issued, nor does it grant the alien any right to remain in the United States.

*Id.* at 1308 (emphasis added); *see also United States v. Garcia,* 875 F.2d 257 (9th Cir.1989).

Other circuits agree. *See, e.g., Joseph v. Landon,* 679 F.2d 113, 115 (7th Cir.1982):

An initial approval of a visa petition does not alone give the beneficiary of the petition an immediate right to an immigrant visa. Rather, the petition is approved merely because there appears prima facie evidence of qualification for issuance of the visa. After initial approval, the alien must satisfy the standard of admissibility for permanent residents upon arrival in this country or upon application for a change of status while within the country. As we held in *De Figueroa [v. INS,* 501 F.2d 191 (7th Cir.1974) ], the initial approval of a petition does not give an alien an immediate right to a visa.

*See also United States v. Bazargan,* 992 F.2d 844 (8th Cir.1993).

Thus, there is a significant difference between the filing of a visa petition and the receipt of an actual visa. Defendant in this case, at the time he purchased the firearm and filled out the ATF forms, did not have the ability to file an I–485 to change his status because his date had not yet been published. He was required to wait until his priority date had been published by the INS. Unlike the defendant in *Brissett,* defendant here had not *and could not* take the final step in the process, the filing of his status change documents (I–485).

### B

Two INS Operating Instructions also support this conclusion.

Section 242.1a(23) provides:

See OI 245.1(a) before issuing an order to show cause against an alien who may be eligible for adjustment of status. Pending final adjudication of a petition which has been filed, *the district director will not deport,* or institute proceedings against, *the beneficiary of the petition if approval of the petition would make the beneficiary immediately eligible for adjustment of status* under § 245 of the Act . . .

And section 245.1(a) provides that:

An otherwise eligible alien who is unlawfully in the United States and who has not heretofore filed a section 245 application shall normally be afforded an opportunity to file such an application prior to the institution of deportation proceedings. *An application filed under section 245 may be filed concurrently with a visa petition Form I–130 or I–140 if approval of the visa petition would make a visa immediately available.*

(Emphasis added).

Defendant contends that these regulations demonstrate that the INS considers aliens in his position to be lawfully in the country and not deportable as illegal aliens. Defendant argues that he was, at the time he purchased the firearms, "immediately eligible for adjustment status" under section 242.1a(23), and thus, the district director *could not deport him.*

The director of this district of the INS, the agency charged with carrying out these regulations, disagrees. The United States has provided the court with a declaration from the INS that defendant is incorrectly interpreting these regulations. The declaration also provides the court with the interpretation of the regulations by the INS. According to the declaration:

Operating Instruction 242.1a(23) sets forth the INS policy against deporting and instituting deportation proceedings against aliens who have filed a Form I–130 visa petition *if* approval of that visa petition would make the alien 'immediately eligible' to adjust his status. It is my interpretation . . . that an alien is 'immediately eligible' to adjust his status only if his immigrant visa is 'immediately available.' In other words, this shield against deportation and proceedings applies only to aliens who have a visa 'immediately available.' The phrase 'immediately eligible' does not refer to an alien whose visa petition has been approved, but whose priority date has not been published. Rather, it refers to an alien for whom an immigrant visa was immediately available. . . . In the case of an alien who, like Fermin Revuelta, was the beneficiary of an approved visa petition filed by an LPR but who could not apply for adjustment of status because his priority date was not yet current, OI 242.1a(23) does not, and did not, bar deportation or the institution of proceedings. This was the interpretation current in the San Francisco District . . . including the period [in which the events occurred in this case].

"[T]he question for the court is whether the agency's answer is based on a permissible construction of the [regula-

tion]." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Defendant advances what he considers to be a more reasonable interpretation of the regulations, instead of deferring to the interpretation proffered by the INS. To do so is inappropriate under *Chevron*. As the Ninth Circuit has held, the court need not conclude that the agency's interpretation of the guideline is "the only reasonable one, or even the 'best' one." *Queen of Angels/Hollywood Presbyterian Med. Ctr. v. Shalala*, 65 F.3d 1472, 1477 (9th Cir.1995). The court need only conclude that it is a "permissible" one. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 414, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993).

Indeed, the interpretation of the regulation proffered by the INS is reasonable. First, it is consistent with Ninth Circuit case law holding that a visa petition is qualitatively different from a visa: the latter ensures an alien's right to be here legally, whereas the former only gives the alien the opportunity to seek a visa. *See Tongatapu*, 736 F.2d at 1308. Second, in cases such as this, where it took more than five years to publish a date, it is more consistent with the Congressional mandate that an alien not be considered lawfully present in the United States until his date is published by the Visa Bulletin. Otherwise, Congress' intent to limit the number of aliens who can change their status yearly would be compromised.

Section 242.1a(23) and 245.1(a) instruct the director not to deport the beneficiary of an I–130 petition only *if* approval of the petition would make the beneficiary immediately eligible for adjustment. Defendant, however, was not immediately eligible for adjustment at the time he purchased the firearms. He still needed to wait until his priority date was published and his form I–485 was filed and considered.

## IV

Should these criminal charges against this defendant depend upon such a parsing of the immigration statutes and regulations? That is, are the objectives of these criminal statutes consistent with such a method of analysis? The court has reviewed the legislative history of the statutes with these questions in mind.

Section 922(g)(5) was enacted in 1968 as part of Title VII of the Omnibus Crime Control and Safe Streets Act ("the Act"). Congress passed the Act in response to the perceived violence that had swept through the United States, highlighted by the murders of Martin Luther King, Jr. and Senator Robert Kennedy. *See Huddleston v. United States*, 415 U.S. 814, 825, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974).

The United States Supreme Court in *Scarborough v. United States* scrutinized the legislative history, and concluded that the Act "was a last-minute amendment ... enacted hastily with little discussion and no hearings." 431 U.S. 563, 569, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977). Although it was hastily enacted, the Supreme Court noted that the legislative history nevertheless demonstrated that Congress "sought to rule broadly-to keep guns out of the hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.'" *Scarborough*, 431 U.S. at 572, 97 S.Ct. 1963; *see also Stevens v. United States*, 440 F.2d 144 (6th Cir.1971) (republishing the legislative history of the Act).

The sponsor of the bill, Senator Long of Louisiana, stated that the Act was designed to prohibit, *inter alia*, "an alien ... illegally in the United States ... [from] carrying firearms. He is one who should not be trusted to carry firearms." 114 Cong. Rec. 13,867–69 (1968); *see also United States v. Verrecchia*, 196 F.3d 294, 300 (1st Cir.1999). Many of the Senators in support of the legislation made similar comments about the purpose of the bill.

The Second Circuit, in *United States v. Toner*, analyzed the legislative history of the Act, and summarized the reasoning behind its enactment:

> Illegal aliens are aliens who have already violated a law of this country. They are subject to deportation. See 8 U.S.C. § 1251(a)(9). Moreover, illegal aliens are those who ... '[are] likely to maintain no permanent address in this country, *elude detection through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood* .... [O]ne seeking to arrange an assassination would be especially eager to hire someone who had little commitment to this nation's political institutions and who could disappear afterwards without a trace....'

*Toner*, 728 F.2d 115, 128–29 (2d Cir.1984) (citations omitted) (emphasis added).

That language is not specifically applicable to this defendant in the circumstances of this case. But the court must conclude, based on the legislative history, that Congress intended to set forth a bright-line rule: those individuals who were not yet legally in this country should not purchase firearms. Those individuals, according to Congress, are in the aggregate more likely to commit crimes involving firearms, and are also harder to track because they are less likely to have permanent residences and as a result, can more easily evade the law. In other words, the Act was broadly intended to prohibit the possession of firearms by all those individuals who were not legally in this country.

The legislative history of section 922(a)(6) reflects the same concerns. *See United States v. Pricepaul*, 540 F.2d 417, 420 (9th Cir.1976) ("The legislative history of Title IV, of which 18 U.S.C. § 922(a)(6) is a part, demonstrates a similar purpose" to the history of § 922(g)(5).). In fact, the United States Supreme Court in *Huddleston*, 415 U.S. at 824–25, 94 S.Ct. 1262, noted:

> Section 922(a)(6) ... was enacted as a means of providing adequate and truthful information about firearms transactions. Information drawn from records kept by dealers was a prime guarantee of the Act's effectiveness in keeping 'these lethal weapons out of the hands of ... persons whose possession of them is too high a price in danger to us all to allow.' 114 Cong. Rec. 13219 (1968) (remarks of Sen. Tydings).

That legislative intention is consistent with the interpretation of the immigration statutes and regulation discussed above, and with the above-cited cases.

## V

The court therefore DENIES defendant's motion to dismiss counts one through three of the superseding indictment.

There will be a status and trial setting conference on June 30 2000, at 1:30 p.m.

IT IS SO ORDERED.