**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0110n.06

No.  13-1099

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 07, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| OBIEL LUNA-SANTILLANES, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:  SILER, MCKEAGUE, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge**.  On August 23, 2012, a jury found defendant Obiel Luna-Santillanes (Santillanes) guilty of (1) conspiracy to distribute and to possess with intent to distribute heroin and cocaine, 21 U.S.C. §§ 841(a), 846; (2) possession with intent to distribute cocaine—aiding and abetting, 21 U.S.C. § 841(a); 18 U.S.C. § 2; (3) possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c); and (4)-(7) four counts of being an alien in possession of a firearm, 18 U.S.C. § 922(g)(5).  He appeals the district court's order denying his motion to suppress evidence seized as a result of the warrantless installation of a GPS tracking device on a red Lincoln Aviator, and challenges the sufficiency of the evidence and the constitutionality of the jury-selection procedures.  We **AFFIRM**.

## I.  BACKGROUND

Santillanes's arrest arose from a Drug Enforcement Agency (DEA) investigation into an alleged drug-trafficking organization near Detroit.  Since October 2010, DEA agents had been receiving information from a confidential source (the CS) regarding the organization, which agents

referred to in warrant applications as the "Luna-Santillanes marijuana trafficking organization." The CS had provided information about a person named Zimiri Jimenez[1] (known at the time only as Seymour) whom agents had determined was coordinating and directing marijuana deliveries for the organization.

On March 4, 2011, the CS informed DEA Task Force Officer (TFO) Todd Murray that Jimenez was using a cell phone with the number 313-254-6219, and was driving a red Lincoln Aviator when making narcotics deliveries. A week later, the CS informed Murray that Jimenez, calling from the 6219 phone, had told the CS that he expected a shipment of cocaine to arrive in Detroit in about four days. Based on that information, on March 15, 2011, Murray sought and obtained a warrant to secure location information from the 6219 cell phone, hoping that by tracking the phone he could locate the organization's stash houses.

During this same time period, officers conducted surveillance of a house located at 60 Stoner Street in River Rouge, Michigan. On March 22, 2011, Murray observed the red Aviator associated with Jimenez parked in front of the house and also observed a silver Chrysler Sebring parked in the back. Title searches revealed that the Aviator was registered to Donnita Grace Cleveland from Highland Park, Michigan, and the Sebring was registered to Santos Martinez-Guerrero from Detroit, neither of whom was a suspect in the investigation.

On March 23, 2011, at Murray's direction, the CS called the 6219 number and, speaking to Santillanes, requested a sample of heroin. Santillanes told the CS to meet one of his associates at a parking lot near Vernor and Interstate 75. The CS went to the lot with an undercover officer, TFO

---

[1]Jimenez is listed on the district court docket as "Zimiri Jimenez, also known as Zimri Rodilfo Jiminez." The Government refers to him as "Jiminez" throughout its brief, but we use the district court's spelling here.

Keith Marshall. Jimenez arrived in a car that Murray recognized as the silver Sebring that had been parked behind the Stoner Street house. Jimenez met with the CS and Marshall, and gave Marshall a heroin sample.

On April 13, 2011, the CS informed Murray that Santillanes and two others planned to drive to "pick up some cocaine" the next day. The CS said they would take two cars—the Aviator and a white Trailblazer—and that Santillanes would not be in the same car as the cocaine. Agents placed GPS trackers on both vehicles that day.

The next day, Murray tracked the location of the 6219 phone and the two vehicles as they traveled to Chicago and back in close proximity to each other. As the cars and phone neared Detroit, DEA agents and officers set up surveillance along Interstate 94. When officers spotted the Aviator, they notified the Michigan State Police and asked the police to conduct a traffic stop. During the stop, the Aviator's driver and sole occupant, Jose Chavira-Velazquez (Velazquez), consented to a search of the vehicle and the state troopers found a bag containing three bricks of heroin. Officers removed the GPS devices from the Aviator and the Trailblazer within a matter of hours. After the stop, the 6219 phone was no longer used.

On May 1, 2011, the CS told Murray and TFO Brian Elko that Velazquez and Jimenez were now using a black Mazda rental car to conduct narcotic transactions, and stated that when they took the Mazda they would leave the Sebring parked at a Sterling Heights apartment complex. On May 2, 2011, Elko and Murray found the Sebring at the apartment complex and attached a GPS device to it. On May 8, 2011, they attached a GPS device to the Mazda.

On May 9, 2011, Murray and Elko watched while the CS met with Jimenez and Velazquez to get heroin. Jimenez and Velazquez arrived in the Mazda, talked with the CS, Jimenez placed heroin in the Mazda for the CS, and then Jimenez and Velazquez left in the Sebring.

The next day, at Murray's direction, the CS called Santillanes at 313-254-8857, while Murray listened and recorded the conversation. Santillanes asked whether the CS had "like[d] that stuff," and stated that he had "a bunch more" and "some green airforces" —apparently a code term for marijuana—on the way. The CS asked Santillanes how much he should charge for "that stuff" since he had not sold it before. Santillanes advised him to mark it up "ten," and charge $80,000.

On July 6, 2011, after being told by the CS that Santillanes had just received a shipment of drugs, Murray, Elko and TFO Paul Tennies conducted surveillance at the Stoner Street residence. They saw Velazquez exit the house and start digging with a shovel in the back yard, while Jimenez and Santillanes watched. Eventually Tennies saw Jimenez reach into the hole and pull out a black object that appeared to be a brick of narcotics and take it inside the house. An hour later Jimenez came out of the house and removed a black plastic bag with something inside it from the hole and took it inside the residence.

Murray obtained a search warrant for the residence the next day, which was executed on July 8, 2011. Santillanes, Jimenez, and Velazquez were inside the house—Santillanes in the east bedroom, Velazquez in the west bedroom, and Jimenez in the bathroom. Officers recovered a loaded Glock .40 caliber semi-automatic pistol, three cell phones (including the 8857 phone), three tactical vest covers, and miscellaneous documents from the east bedroom. One of the phones contained pictures of Santillanes holding firearms found elsewhere in the house. In the basement, agents found a Norinco MAK-90 Sporter semi-automatic rifle and a cell phone. They seized two

laptops and a cell phone from the kitchen; a Garmin GPS and documents from the Sebring; and a Cobray Street Sweeper twelve-gauge shotgun, an Intratec nine-millimeter semi-automatic pistol, and ammunition from the hole in the backyard.

Santillanes was arrested two weeks later, after a run-in with agents in an investigation targeting another drug trafficker, Oday Khalasawi. Agents in that investigation had heard that Khalasawi had two kilograms of cocaine for sale and had gotten a confidential source to arrange to purchase it. While conducting surveillance of Khalasawi's house on the morning of the purchase, officers saw Santillanes and Khalasawi leave the house and get into the Sebring, and saw Jimenez and Velazquez leave and get into a minivan. Both cars started driving toward the location of the planned sale and officers pulled them over. They found two kilograms of cocaine and a loaded handgun in the minivan and arrested Santillanes, Jimenez, and Velazquez.

At trial, in addition to testimony regarding the above incidents, cooperating witness Arkan Alyas testified that in February 2010, he witnessed Santillanes drive away with between 700 and 800 pounds of marijuana that had just been delivered to the Detroit tire shop where Alyas worked. Alyas also testified that he had previously witnessed Santillanes advise Oday Eunice, a marijuana trafficker, to wait to make a marijuana delivery because "the situation at the border" was not good.

A grand jury returned an indictment against Santillanes, Jimenez, and Velazquez. Khalasawi was later added as a defendant in a superseding indictment.

## II. DISCUSSION

Santillanes appeals the denial of his motion to suppress, and challenges the sufficiency of the evidence and the constitutionality of the jury-selection procedures.

## A.    <u>MOTION TO SUPPRESS</u>

When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000).

Santillanes contends that his Fourth Amendment rights were violated when Murray attached the GPS device to the Aviator and used it to monitor the vehicle's movements without first obtaining a warrant, and that therefore all evidence seized as a result of that violation—including the heroin seized during the traffic stop and the evidence seized from the Stoner Street house—should not be admissible against him.

The district court held a suppression hearing, at which Special Agent Edward Moore of the DEA and TFO Murray testified. The district court found suppression unwarranted because (1) Santillanes lacked standing to challenge the search of the Aviator, and in the alternative, (2) even if Santillanes had standing to contest the search, the inevitable-discovery and independent-source exceptions to the exclusionary rule permitted admission of the evidence. We affirm.

The simplest response to Santillanes's arguments is that, assuming standing, the officers would have inevitably discovered all of the evidence seized. The independent-source doctrine permits the introduction of evidence "if the government can show it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996) (quoting *Nix v. Williams*, 467 U.S. 431, 442–43 (1984)). The inevitable-discovery doctrine permits the admission of illegally obtained evidence if the government proves that it "inevitably would have been acquired through lawful means had the government misconduct not occurred." *United States v. Kennedy*, 61 F.3d 494, 497–98 (6th Cir. 1995) (citing *Nix*, 467 U.S. at

444). The doctrine "'requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" *Id.* at 498 (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)).

The exceptions apply here because, as the district court found, the Government established that the officers would have found the car and been able to conduct the traffic stop without using the GPS tracking information. The CS told Murray about the planned trip to obtain drugs, that Santillanes—a known user of the 6219 phone—would be on the trip, and that the group would be driving the Aviator and the Trailblazer. In short, officers knew the date of the planned trip, its purpose, the cars to be used, and of Santillanes's involvement, without any reliance on the GPS device. The only information that officers gleaned from the use of the GPS device was information regarding where the group was at any given moment, but they got the same information using the location data from the 6219 phone, for which they had a warrant. Accordingly, the district court correctly found that officers had an independent source for the location data and, based on that information and the information from the CS, would have inevitably spotted the Aviator on Interstate 94 and been able to conduct the stop.

Because the evidence from the traffic stop was, therefore, admissible, there is no need to address Santillanes's arguments regarding its use in the warrant application.

## B.    SUFFICIENCY OF THE EVIDENCE

Next Santillanes argues that the Government presented insufficient evidence on each count to sustain the guilty verdicts on the conspiracy and gun charges.[2]

---

[2]Santillanes did not argue insufficiency with respect to Count 2, possession with intent to distribute cocaine—aiding and abetting.

This court "review[s] *de novo* a challenge to the sufficiency of the evidence supporting a criminal conviction." *United States v. Carson*, 560 F.3d 566, 579 (6th Cir. 2009). In doing so, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). We "neither independently weigh[] the evidence, nor judge[] the credibility of witnesses who testified at trial." *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999).

### 1. CONSPIRACY

To sustain Santillanes's conspiracy conviction, the Government must point to evidence sufficient to prove: (1) an agreement to violate the drug laws; (2) Santillanes's knowledge of and intent to join the conspiracy; and (3) Santillanes's participation in the conspiracy. *United States v. Welch*, 97 F.3d 142, 148–49 (6th Cir. 1996), *cert. denied*, 519 U.S. 1134 (1997). The agreement need not be express; "a tacit agreement or mutual understanding" is sufficient. *United States v. Ramirez*, 635 F.3d 249, 258 (6th Cir. 2011). And, although a defendant's "mere association with conspirators is not enough to establish participation in a conspiracy," *Pearce*, 912 F.2d at 162 (citation omitted), "a defendant's guilty knowledge and voluntary participation may be inferred from surrounding circumstances," *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991) (citation and emphasis omitted), and from "the defendant's actions and reactions to the circumstances," *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001).

In objecting to the sufficiency of the evidence to support the conspiracy charge, Santillanes contends that "there was simply no evidence beyond speculation that [he] was connected to any of the drugs seized." Specifically, he argues that the Government did not introduce evidence showing

"that he participated in any drug related activities" or that he "repeatedly bought drugs from, sold drugs to, and middled drugs for various co-conspirators."

We conclude that the evidence was sufficient. First, evidence regarding the CS's May 10, 2011 phone call to the 8857 number linked Santillanes to the May 9, 2011 transaction in which Velazquez and Jimenez delivered heroin to the CS. In the phone conversation, which was recorded and played for the jury, Santillanes asked the CS if he "like[d] that stuff," told the CS that he had "a bunch more" if the CS "want[ed] to make something," and advised the CS regarding how much to mark up the price of the heroin for resale. A rational trier of fact could infer from the conversation that Santillanes had provided the heroin for the May 9 transaction and was offering to provide more.

The Government also introduced evidence connecting Santillanes to the two kilograms of cocaine recovered in the July 21, 2011 traffic stop. DEA Agent Edward Moore testified regarding his investigation of Khalasawi and Khalasawi's plan to sell the cocaine to a confidential informant working with Moore. Officers who assisted with the arrest testified that on the morning of the planned sale, Santillanes, Khalasawi, Jimenez, and Velazquez all left Khalasawi's house at the same time and drove toward the gas station where the transaction was supposed to take place. Santillanes and Khalasawi took the Sebring, and Jimenez and Velazquez drove a minivan. Officers stopped the vehicles en route and found the two kilograms of cocaine and a loaded handgun in the minivan. Khalasawi and Santillanes were not in the same vehicle as the cocaine, but Special Agent Edward Donovan testified that in his experience, in such situations the owner of the drugs will ride in a separate vehicle from the drug courier. A rational trier of fact could infer from this evidence that Santillanes was aware of and participating in the planned transaction. This inference gains

additional support from the fact that Santillanes gave officers a fake name during the traffic stop. *See Salgado*, 250 F.3d at 447 ("[A] defendant's participation in the conspiracy's common purpose may be inferred from the defendant's actions and reactions to the circumstances.").

Finally, other evidence showed that, except for a brief trip to California, Santillanes lived at the Stoner Street residence with Jimenez and Vazquez, and that Santillanes used cell phones and vehicles connected with the drug transactions and the trip to Chicago, and Santillanes was present when a suspected brick of heroin was removed from the hole in the backyard. Taken as a whole, this evidence was sufficient for a jury to find Santillanes knew of and participated in an agreement to violate drug laws, as required to sustain his conviction under § 846.

## 2. **FIREARMS**

The jury convicted Santillanes of one count of possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c) and four counts of being an alien in possession of a firearm, 18 U.S.C. § 922(g)(5). Santillanes argues that there was insufficient evidence to support the convictions because "none of the witnesses testified that they had frequently seen [Santillanes] carrying a gun during drug deals," and Santillanes's fingerprints were not found on any of the firearms. We disagree.

### i. **ALIEN-IN-POSSESSION**

To support a conviction under § 922(g)(5), the Government must show that: (1) the defendant is an illegal alien, (2) he knowingly possessed the firearm, and (3) the firearm traveled in or affected interstate commerce. 18 U.S.C. § 922(g)(5)(A). Santillanes concedes the first and third elements, but argues that there was insufficient evidence of possession.

Possession of a firearm "may be either actual or constructive and it need not be exclusive but may be joint." *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973), *abrogated on other grounds by Scarborough v. United States*, 431 U.S. 563 (1977). Both actual and constructive possession "may be proved by direct or circumstantial evidence." *Id.* Actual possession requires that the defendant have "immediate possession or control" of the firearm. *Id.* Constructive possession requires that the defendant "knowingly ha[ve] the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Id.* A defendant's mere proximity to a firearm is insufficient to show constructive possession. *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) ("'Presence alone' near a gun . . . does not 'show the requisite knowledge, power, or intention to exercise control over' the gun to prove constructive possession.") (emphasis omitted) (quoting *United States v. Birmley*, 529 F.2d 103, 107–08 (6th Cir. 1976)). "[O]ther incriminating evidence, coupled with presence" is required "to tip the scale in favor of sufficiency." *Birmley*, 529 F.2d at 108. For example, evidence of a defendant's "dominion over the premises where the firearm is located" is sufficient to establish constructive possession of the firearm. *United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007) (citation omitted). But where possession of premises is nonexclusive, the evidence must show some additional connection between the defendant and the firearm to establish constructive possession. *See United States v. Bailey*, 553 F.3d 940, 944 n.3 (6th Cir. 2007) (discussing with approval "the widely held rule that nonexclusive possession of the premises cannot establish constructive possession over items found within the premises").

The Government introduced sufficient evidence of possession to support the § 922(g)(5) charges. The firearms at issue were the Glock .40 caliber semi-automatic pistol, the Norinco

MAK-90 Sporter semi-automatic rifle, the Cobray Street Sweeper twelve-gauge shotgun, and the Intratec nine-millimeter semi-automatic pistol. All four firearms were found at the Stoner Street residence. Officers testified that Santillanes was living at the residence with Jimenez and Velazquez, that Santillanes was found in the east bedroom, and that the Glock was in plain view under the night stand in that bedroom, where officers also found Santillanes's cell phone. Based on these facts, a rational trier of fact could find that the room was Santillanes's bedroom and that he constructively possessed the Glock. *See United States v. Malone*, 308 F. App'x 949, 952 (6th Cir. 2009) (collecting cases and observing, "[t]his court has repeatedly and frequently held that constructive possession may be shown to exist if the contraband is found in a defendant's bedroom or personal living space"); *United States v. Grubbs*, 506 F. 3d 434, 440–41 (6th Cir. 2007) (noting, "we have sustained a conviction for constructive possession when the weapon is found in areas over which the defendant exercised control, such as his bedroom").

The Norinco rifle was found in the basement, and the Street Sweeper shotgun and Intratec pistol were in the hole in the backyard. The Government introduced photographs from Santillanes's cell phone showing him holding the Street Sweeper and Norinco firearms in the Stoner Street residence, and TFO Tennies testified that he saw Santillanes monitoring the removal of items from the hole in the backyard of the residence just two days prior to the raid. The photographs are evidence that Santillanes actually possessed the Street Sweeper and Norinco firearms.[3] And, a

---

[3]Santillanes's attorney conceded as much in closing argument. He stated,

> Pictures of [Santillanes] were taken on the cell phone, of him having a gun strapped to his chest, that he was wearing some kind of fatigues or whatever. He is an alien who did in fact possess that firearm or those firearms. He's not denying this incident. Those pictures show that he is an alien in possession of the firearm. We are not asking you jurors to disregard the situation.

rational trier of fact could infer from Tennies's testimony and the evidence that Santillanes resided at the Stoner Street residence, that he had knowledge of and, at least, shared control over the Intratec pistol. *See Grubbs*, 506 F.3d at 440 (suggesting that it would have been rational for the jury to conclude that the defendant houseguest had constructive possession of the firearm found under his brother's mattress if the evidence had showed that the defendant, *e.g.*, "owned the home where the handgun was found, . . . had some contact with the room where it was found, or . . . knew of its location") (internal citations omitted).

### ii. POSSESSION IN FURTHERANCE OF DRUG TRAFFICKING

This count stems from the firearm found in the minivan occupied by Jimenez and Velazquez during the traffic stop on the day of the arrest. Santillanes was convicted on the charge under *Pinkerton* liability. *See Pinkerton v. United States*, 328 U.S. 640 (1946). Pursuant to the *Pinkerton* doctrine, a conspirator may be convicted for reasonably foreseeable "substantive offenses of other conspirators committed during and in furtherance of the conspiracy." *United States v. Martin*, 920 F.2d 345, 348–49 (6th Cir. 1990).

The evidence supports Santillanes's conviction on this charge. As discussed above, sufficient evidence supported the jury's finding that Santillanes was involved in a drug conspiracy with Jimenez and Velazquez. *See United States v. Henning*, 286 F.3d 914, 920 (6th Cir. 2002) ("The *Pinkerton* rule is necessarily premised on the existence of a conspiracy.").

Sufficient evidence also supported the jury's finding that Jimenez and Velazquez possessed the handgun in furtherance of the planned cocaine sale to the confidential informant. To prove the "in furtherance" element, the Government must show a "specific nexus between the gun and the crime charged," *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001), *i.e.*, the firearm must

"advance, promote, or facilitate the crime." *United States v. Paige*, 470 F.3d 603, 609 (6th Cir. 2006) (citing *Mackey*, 265 F.3d at 462–63). Factors relevant to finding a nexus between the firearm and the crime include whether the gun was quickly and easily available for use, what type of gun it was, whether it was loaded, the legality of its possession, the type of drug activity conducted—*e.g.*, the size of the sale—and the time and circumstances under which the gun was found. *Mackey*, 265 F.3d at 462. Here, the firearm was a loaded nine-millimeter semi-automatic handgun. It was found, with two kilograms of cocaine, in the minivan occupied by Jimenez and Velazquez when they were stopped en route to the scheduled drug transaction. The cocaine was in a gift bag on the floor behind the drivers seat. The handgun was in a cavity behind the glove box. A picture of the gun in the cavity was entered into evidence, and the jury was instructed that it must find that the gun was "strategically located so that it was quickly and easily available for use" in order to find that it was possessed "in furtherance of" the drug crime. Agent Donovan testified that in his experience, drug dealers often bring guns to a drug deal because "the most volatile time of a drug deal is when the drugs and the money are about to be exchanged." Thus, the Government presented evidence that the gun was loaded, small, accessible, and found in a vehicle being used to transport a large amount of cocaine to a drug transaction, and that it is not uncommon for drug dealers to carry guns in such circumstances. This is sufficient evidence for a rational trier of fact to find that Jimenez and Velazquez possessed the gun in furtherance of a drug crime.

Sufficient evidence also supports a finding that Santillanes would have foreseen that Jimenez and Velazquez would carry the firearm to help advance the conspiracy. *See Martin*, 920 F.2d at 348. This court has held that evidence supporting an inference "that a defendant in a drug conspiracy should have foreseen his coconspirator's firearm possession . . . must be more than a mere

generalized presumption that drug transactions involve guns." *United States v. Wade*, 318 F.3d 698, 702 (6th Cir. 2003). Rather, the evidence must show that the defendant either "'knew the weapon was present, or at least knew it was reasonably probable that his coconspirator would be armed'" because, *e.g.*, "the quantity of drugs at issue is so large that the participants would expect others to be carrying protection." *Id.* (quoting *United States v. Cochran*, 14 F.3d 1128, 1133 (6th Cir. 1994)). The two kilograms of cocaine at issue here, which Agent Donovan testified could be sold for between $52,000 and $64,000, is sufficient under this court's precedent to support an inference that Santillanes should have foreseen that Jimenez and Velazquez would carry a gun. *See id.* (collecting cases, *e.g.*, *United States v. Odom*, 13 F.3d 949, 959 (6th Cir. 1994) (finding gun possession foreseeable in conspiracy involving at least 2.385 kilograms of cocaine); *United States v. Christian*, 942 F.2d 363, 367 (6th Cir. 1991) (finding gun possession foreseeable where conspirators' car contained $60,000), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995)); *see also United States v. Woods*, 604 F.3d 286, 291 (6th Cir. 2010) (reviewing decisions of this court finding an inference of foreseeability based on the quantity of drugs and noting, "[e]ach of these cases involved narcotics worth at least $60,000 located near the firearm"). The Government also presented evidence that guns were found in the house that Santillanes shared with his conspirators, and that they stored the guns and drugs together in the hole in their backyard. Taken as whole, this was sufficient evidence to support the inference that Santillanes would have foreseen that his coconspirators would be armed.

## C. **JURY SELECTION**

Finally, Santillanes argues that the district court's jury selection procedures unconstitutionally excluded Hispanics from the jury array. Santillanes forfeited this issue by failing

to adequately raise it below. Santillanes filed a motion with the district court titled Motion

Challenging Jury Selection Process, without any exhibits or brief in support. The body of the

motion, with paragraph numbers and breaks omitted, reads as follows:

> Mr. Luna-Santillanes is a Mexican citizen being charged in an indictment involving conspiracy to possess with intent to deliver heroin, cocaine and marijuana and other criminal charges. The jury selection process in the Eastern District of Michigan produces an under representation of Hispanics. As a result, Mr. Luna-Santillanes faces a jury that cannot adequately have a fair cross section of Hispanics in his jury array. *US v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998) ordered a new trial based on the under representation of Hispanics. In order for Mr. Luna-Santillanes to have a constitutionally required trial, this Court must conduct a hearing to determine whether there is an under representation of Hispanics in the Eastern District of Michigan jury array and if not, what remedy, if any, can be offered to Mr. Luna-Santiallnes [sic].

> WHEREFORE, Mr. Luna-Santillanes respectfully requests that this Honorable Court to conduct [sic] a hearing to determine whether Mr. Luna-Santillanes is being denied a fair jury trial, including ordering the access to the jury records relating to Hispanics in the jury array and that this Court conduct an evidentiary hearing.

The district court, pursuant to Eastern District of Michigan Administrative Order No. 00-AO-

060, referred the motion to the Chief Judge. Addressing the motion, the Chief Judge explicitly

construed it as a request for access to records to support an intended future motion to challenge the

jury selection process, and not as the challenge itself, stating: "[T]he Court views its inquiry as

limited to Defendant's request for juror information and records, as opposed to the merits of any

constitutional challenge he might pursue using such juror information." Pursuant to Administrative

Order No. 00-AO-060, Santillanes was already entitled to review information regarding juror

number, race, and Hispanic ethnicity for the current jury wheel, and records relating to prior jury

wheels were available for public inspection pursuant to 28 U.S.C. § 1868. The Chief Judge denied

Santillanes's request for access to additional records on the basis that Santillanes had not shown how

additional records would be of assistance in proving a violation of the Jury Selection and Service

Act or the Sixth Amendment. *See* Administrative Order No. 00-AO-060 (setting forth a good-cause standard for access to information beyond juror number, race, and ethnicity) (quoted in *United States v. O'Reilly*, 05-CR-80025, 2008 WL 115537, at *2 (E.D. Mich. Jan. 10, 2008)). Santillanes filed nothing else with the district court on the issue and made no further argument. Santillanes was on notice that if he wished to further challenge the jury selection process he was required to renew his objection and present his case. To the extent Santillanes now challenges the denial of his request for an evidentiary hearing, he forfeited this argument by failing to renew the issue. To the extent he challenges the denial of further discovery, he has not shown that the additional information was necessary. And, to the extent he challenges the actual jury selection procedures, he has made no showing that Hispanics were systematically excluded from the jury array.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the conviction in all respects.