
FILED

Apr 12 2016, 10:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
Ruth Ann Johnson
Marion County Public Defender

Suzy Danielle St. John
Deputy Public Defender

Victoria L. Bailey
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Stephen Richard Creason
Deputy Attorney General

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 49S02-1506-CR-376

SCOTT HITCH,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Marion Superior Court, Criminal Division 17, No. 49G17-1310-FD-065095
The Honorable Clayton A. Graham, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 49A02-1404-CR-295

**April 12, 2016**

**Rucker, Justice.**

Scott Hitch appeals the trial court's determination declaring he committed a crime of domestic violence. Concluding there was no violation of Hitch's Sixth Amendment right to trial by jury, and further concluding the evidence was sufficient to sustain the determination, we affirm the judgment of the trial court.

**Facts and Procedural History**

Scott Hitch and Erica Bruce lived together between January and August 2013. When their relationship ended Bruce moved out of the shared apartment to live with the father of her two children. Several weeks later, after Bruce's relationship with her children's father deteriorated, Bruce temporarily moved back in with Hitch. She had arranged for an apartment in the same complex and was staying with Hitch until it was ready. Bruce did not unpack her bags because she planned to move shortly thereafter. Hitch testified at trial that he did not have a "romantic relationship" with Bruce after she moved out in August. See Tr. at 163-64. Describing Hitch as her "ex-boyfriend" Bruce testified their relationship ended the night Hitch attacked her. Tr. at 69.

On October 2, 2013, joining his boss for drinks, Hitch along with Bruce visited a downtown Indianapolis pub. Later that evening the couple proceeded to a local restaurant where they got into an argument when Bruce began comparing Hitch to her children's father. During the course of the argument Hitch flicked hot chili onto Bruce's face. Embarrassed, Bruce walked out of the restaurant. However, because she did not have money for a taxi, Bruce rode back to the apartment with Hitch.

Once inside, the argument escalated when Bruce sent a text message to the children's father to come pick her up. According to Bruce, Hitch demanded that she "get the f*** out right now." Tr. at 76. Bruce testified that she asked Hitch if she could stay the night because she did not have transportation. In response, according to Bruce, Hitch grabbed her by the neck and positioned himself on top of her. Eventually Bruce managed to push Hitch away and call 911. The responding officer found Bruce outside the apartment with some of her belongings. He examined Bruce and noted her neck was red and sensitive to the touch. Bruce spent the night

under observation at a local hospital where she reported neck pain and tenderness. According to Hitch, he "never touched [Bruce]." Tr. at 162, 176.

The State charged Hitch with Count I strangulation as a class D felony, Count II intimidation as a class A misdemeanor, and Count III battery as a class A misdemeanor. Prior to the jury trial on March 27, 2014 the State dismissed the intimidation charge, and the jury found Hitch guilty of battery only.[1] Thereafter the trial court sentenced Hitch to the maximum term of 365 days imprisonment[2] with twelve days executed and 353 days suspended to probation. Under provisions of Indiana Code section 35-38-1-7.7(a), the trial court also determined Hitch committed a crime of "domestic violence."[3] Hitch objected on grounds his relationship with Bruce did not satisfy the statutory requirements for domestic violence. The trial court disagreed and pursuant to Indiana Code section 35-38-1-7.7(c) advised Hitch that this determination rendered him ineligible to possess a firearm.[4]

Hitch appealed raising the following restated claims: (1) the firearm restriction amounted to additional punishment above the statutory maximum for misdemeanor battery, and because the facts supporting the enhancement were not submitted to a jury the determination ran afoul of the Sixth Amendment; and (2) the evidence was not sufficient to support a finding that he committed a crime of domestic violence. The Court of Appeals reversed the judgment of the trial court based on Hitch's first claim and finding it dispositive did not address his sufficiency

---

[1] The statute provides in relevant part: "A person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery, a Class B misdemeanor. However, the offense is: . . . a Class A misdemeanor if: . . . it results in bodily injury to any other person[.]" Ind. Code § 35-42-2-1(a)(1)(A) (Supp. 2013).

[2] "A person who commits a Class A misdemeanor shall be imprisoned for a fixed term of not more than one (1) year; in addition, he may be fined not more than five thousand dollars ($5,000)." I.C. § 35-50-3-2.

[3] The statute provides in relevant part: "At the time of sentencing, a court shall determine whether a person has committed a crime of domestic violence. . . ."

[4] The statute provides in relevant part: "Upon determining that a defendant has committed a crime of domestic violence, a court shall advise the defendant of the consequences of this finding." One such consequence is "a person who has been convicted of a crime of domestic violence may not possess a firearm. . . ." I.C. § 35-47-4-7(a) (Supp. 2012).

3

claim.  <u>Hitch v. State</u>, 24 N.E.3d 974 (Ind. Ct. App. 2015), <u>vacated</u>.  Having previously granted transfer, we now affirm the trial court's judgment.  Additional facts are set forth below.

**Discussion**

**I.**

We first observe and Hitch concedes he did not object at trial to the domestic violence determination on the grounds of a Sixth Amendment violation.  Instead he objected on sufficiency grounds.  "It is well-settled law in Indiana that a defendant may not argue one ground for objection at trial and then raise new grounds on appeal."  <u>Gill v. State</u>, 730 N.E.2d 709, 711 (Ind. 2000).  The issue is waived.  Thus we must review this claim through the lens of fundamental error.  The doctrine of fundamental error provides an exception to the general rule that the "failure to object at trial constitutes procedural default precluding consideration of the issue on appeal."  <u>Halliburton v. State</u>, 1 N.E.3d 670, 678 (Ind. 2013).  This "exception is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process."  <u>Id.</u> (quoting <u>Mathews v. State</u>, 849 N.E.2d 578, 587 (Ind. 2006)).  "The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process."  <u>Id.</u> (quoting <u>Brown v. State</u>, 929 N.E.2d 204, 207 (Ind. 2010) (internal quotation omitted)).

In <u>Blakely v. Washington</u>, the United States Supreme Court held "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  542 U.S. 296, 301 (2004) (quoting <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000)).  The Court has also made clear that "[i]n stating <u>Apprendi</u>'s rule, [it had] never distinguished one form of punishment from another. Instead, [the Court's] decisions broadly prohibit judicial factfinding that increases maximum criminal sentence[s], penalties, or punishment[s.]"  <u>S. Union Co. v. United States</u>, 576 US ___, 132 S.Ct. 2344, 2351 (2012) (internal quotation omitted).

4

According to Hitch the firearm prohibition constitutes punishment within the meaning of the Sixth Amendment and thus the underlying facts supporting the prohibition—a determination of domestic violence—must be found by a jury and proven beyond a reasonable doubt. Otherwise, Hitch contends, the prohibition is in violation of his Sixth Amendment right to trial by jury as explicated in Apprendi, Blakely and Southern Union. The State counters the firearm prohibition is not a punishment at all, but instead "the intent and effect of a domestic violence determination in Indiana is to facilitate compliance with the pre-existing federal law that prohibits domestic violence offenders from possessing firearms."[5] Br. of Appellee at 11-12 (citations omitted).

Although disagreeing the statute is punitive in nature, the State nonetheless implicates what is commonly referred to as the "intent-effects" test, which provides a useful analytical framework for examining whether the statute here is constitutionally infirm. Under this test a court first determines whether the legislature meant the statute to establish a civil regulatory regime or impose criminal punishment. Wallace v. State, 905 N.E.2d 371, 378 (Ind. 2009) (citation omitted). "If the intention of the legislature was to impose punishment, then that ends the inquiry, because punishment results." Id. On the other hand, if a court concludes the legislature intended a non-punitive regulatory regime, then the inquiry focuses on whether the scheme is so punitive in effect that it transforms what was intended as a civil and regulatory regime into a criminal penalty. Id. With this framework in mind we examine Indiana Code section 35-38-1-7.7 (which we will refer to for convenience as the "firearm prohibition statute").

---

[5] The federal Gun Control Act ("GCA") provides in relevant part:

> It shall be unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(9). The applicable penalty provision reads: "Whoever knowingly violates subsection [(g)] of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both." 18 U.S.C. § 924(a)(2). There is no state-imposed sanction for violating the firearm prohibition statute.

## II.

It is difficult to determine legislative intent in this case because as with most Indiana statutes there is no available legislative history and the statute does not contain a purpose statement. However we have noted that "[i]n the absence of a stated purpose, one way to determine legislative intent is to examine where the statute is located within the Code." Jensen v. State, 905 N.E.2d 384, 390 (Ind. 2009) (citation omitted). And as the Court of Appeals has pointed out, "Section 35-38-1-7.7, which directs the trial court to determine whether a defendant committed a crime of domestic violence, is located in the criminal code." Goldsberry v. State, 821 N.E.2d 447, 465 (Ind. Ct. App. 2005). According to the court this placement along with the legislature's explicit declaration that the statute is "an act to amend the Indiana Code concerning criminal law and procedure" demonstrates "the legislature intended the sanction to be a criminal punishment." Id.

Although we agree location of the statute within the criminal code represents a strong indication the legislature intended a punitive intent, this fact alone is not dispositive. As discussed in slightly more detail later in this opinion the statute also advances a legitimate regulatory purpose, namely public safety by ensuring firearms are kept out of the hands of domestic abusers. And this Court has previously declined to conclude the legislature intended a punitive intent where the statute demonstrated a "legitimate regulatory purpose" even though it was "located solely within the criminal code." State v. Pollard, 908 N.E.2d 1145, 1149-50 (Ind. 2009). We conclude that at the very least there is some amount of ambiguity as to whether the legislature intended to impose punishment by enacting the firearm prohibition statute. Therefore, assuming without deciding the legislative intent behind the statute was to create a civil, non-punitive regulatory scheme, we examine whether the statute is so punitive in effect that it negates that intent.

## III.

In assessing a statute's effect the seven factors the United States Supreme Court outlined in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963), "provide[] some guidance."

6

Wallace, 905 N.E.2d at 379 (quoting United States v. Ward, 448 U.S. 242, 249 (1980)). Although more traditionally employed to analyze claims arising under the *Ex Post Facto* Clause, these factors "have their earlier origins in cases under the Sixth and Eighth Amendments . . . ." Smith v. Doe, 538 U.S. 84, 97 (2003). The seven factors are:

> [1] [w]hether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of *scienter*, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned.

Mendoza-Martinez, 372 U.S. at 168-69 (footnotes omitted). Because these factors "are designed to apply in various constitutional contexts . . . they are neither exhaustive nor dispositive, but are useful guideposts." Smith, 538 U.S. at 97 (internal citations and quotations omitted). Even though no one factor is determinative, we give "greatest weight" to the last factor. Pollard, 908 N.E.2d at 1153. In that regard, "our task is not simply to count the factors on each side, but to weigh them." Wallace, 905 N.E.2d at 379 (citation omitted). We address each factor in turn.

### 1. *Affirmative Disability or Restraint*

The first factor to consider is whether the sanction involves an affirmative disability or restraint. In evaluating this factor we inquire "how the effects of the [sanction] are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." Pollard, 908 N.E.2d at 1150 (citation omitted). The restraint here is obviously direct in that it applies to any person found guilty of domestic violence. And it is not minor because the right of Indiana citizens to bear arms under this State's constitution,[6] which is infringed upon by the firearm prohibition statute, is an interest in both liberty and property protected by the Fourteenth Amendment to the Federal Constitution. See Kellogg v. City of Gary, 562 N.E.2d

---

[6] Article 1, Section 32 provides: "The people shall have a right to bear arms, for the defense of themselves and the State."

685, 693-94 (Ind. 1990).[7]  To be sure, this constitutionally protected right is not without limitations.  See Estate of Heck ex rel. Heck v. Stoffer, 786 N.E.2d 265, 270 (Ind. 2003) (noting the significant number of statutes governing the sale, use and possession of firearms).  But limitations aside, the prohibition nonetheless infringes on an important constitutional liberty.  We are persuaded the first Mendoza-Martinez factor favors treating the effects of the firearm prohibition statute as punitive.

### 2.  Sanctions That Have Historically Been Considered Punishment

We next determine "whether [the sanction] has historically been regarded as a punishment[.]"  Mendoza-Martinez, 372 U.S. at 168.  On grounds other than the intent-effects test at least one federal circuit characterized the firearms possession ban under the federal GCA as imposing a "civil disability."  See United States v. First, 731 F.3d 998, 1008-1009 (9th Cir. 2013).  At least two other circuits refer to the ban not as a punishment but rather as a "collateral consequence" of an underlying conviction.  See Gentry v. Deuth, 456 F.3d 687, 695 (6th Cir. 2006); United States v. Rozier, 598 F.3d 768, 769 (11th Cir. 2010).  This authority provides some amount of guidance on the question before us.  We find more instructive however a decision from the Pennsylvania Supreme Court.  Addressing a defendant's *ex post facto* challenge to the federal firearm ban, and applying the Mendoza-Martinez intent-effects test, with respect to the second factor the court concluded, "[d]isqualifying felons from purchasing or possessing firearms is no more punitive than disenfranchisement or occupational disbarment, sanctions which the United States Supreme Court has deemed non-punitive."  Lehman v. Pa. State Police, 839 A.2d 265, 272 (Pa. 2003) (citing cases).  We agree and believe the same conclusion applies with equal force to defendants convicted of misdemeanors.  See, e.g., Snyder v. King, 958 N.E.2d 764, 781 (Ind. 2011) (involving defendant who was convicted and sentenced for misdemeanor battery and thus by statute disenfranchised during the period of incarceration; Court determined legislature had the police power to deprive all convicted prisoners the right to vote for the duration of their incarceration, and declared the Infamous Crimes Clause of the

---

[7] See also District of Columbia v. Heller, 554 U.S. 570, 576, 595 (2008) (analyzing the federal constitution which dictates:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed" and declaring, "the Second Amendment conferred an individual right to keep and bear arms").

8

Indiana Constitution pursuant to which the legislature was so empowered was "*not* intended to be used primarily as a retributive or deterrent mechanism of punishment" but instead "is properly understood primarily as a regulatory measure"). In sum, we find no authority supporting the proposition that banning firearm possession of a misdemeanant has historically been considered punishment. This factor leans in favor of treating the effect of the statute as non-punitive.

### 3. Finding of Scienter

Third, we consider "whether [the sanction] comes into play only on a finding of *scienter*[.]"[8] Mendoza-Martinez, 372 U.S. at 168. The scienter requirement "is customarily an important element in distinguishing criminal from civil statutes." Wallace, 905 N.E.2d at 381 (citation omitted). If a sanction is not linked to a showing of *mens rea*, then it is less likely to be intended as punishment. Id.

Here, the firearm prohibition statute is not linked to a showing of *mens rea*; and there is no *scienter* requirement.[9] Instead the prohibition is imposed on all persons who have committed a crime of domestic violence. And this is so regardless of the person's intent or awareness of the statute. This factor weighs in favor of treating the statute as non-punitive.

---

[8] *Scienter* is defined as "[a] degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission . . . ." Black's Law Dictionary 1547 (10th ed. 2014).

[9] The statute provides:

> "Crime of domestic violence". . . means an offense or the attempt to commit an offense that:
> > (1) has as an element the:
> > > (A) use of physical force; or
> > > (B) threatened use of a deadly weapon; and
> > (2) is committed against a:
> > > (A) current or former spouse, parent, or guardian of the defendant;
> > > (B) person with whom the defendant shared a child in common;
> > > (C) person who was cohabiting with or had cohabited with the defendant as a spouse, parent, or guardian; or
> > > (D) person who was or had been similarly situated to a spouse, parent, or guardian of the defendant.

I.C. § 35-31.5-2-78 (2012).

### 4. *The Traditional Aims of Punishment*

We next ask, "whether [the sanction's] operation will promote the traditional aims of punishment—retribution and deterrence . . . ." Mendoza-Martinez, 372 U.S. at 168. If a statute promotes the traditional aims of punishment then it is more likely punitive than regulatory. Jensen, 905 N.E.2d at 393. "Retribution is vengeance for its own sake. It does not seek to affect future conduct or solve any problem except realizing 'justice.'" Wallace, 905 N.E.2d at 381 n.12 (citation omitted). On the other hand, "[d]eterrent measures serve as a threat of negative repercussions to discourage people from engaging in certain behavior." Id. We have no reason to believe the legislature enacted the firearm prohibition statute for purposes of retribution. But the statute most certainly serves as strong deterrence by imposing adverse consequences on any person convicted of domestic violence. This factor favors treating the statute as punitive.

### 5. *Application Only to Criminal Behavior*

Under the fifth factor we consider "whether the behavior to which [the sanction] applies is already a crime. . . ." Mendoza-Martinez, 372 U.S. at 168. The fact a statute applies to behavior that is already and exclusively criminal supports a conclusion that its effects are punitive. Wallace, 905 N.E.2d at 382. It is clear the firearm prohibition statute applies only to criminal conduct in that it requires a finding of guilty and is imposed at sentencing. Because a criminal conviction triggers obligations under the statute, we conclude this factor favors treating the statute as punitive.

### 6. *Advancing a Non-punitive Interest*

We next ask "whether an alternative purpose to which [the sanction] may rationally be connected is assignable for it . . . ." Mendoza-Martinez 372 U.S. at 168-69. This factor is best translated as an inquiry into whether the statute advances a legitimate regulatory purpose. Wallace, 905 N.E.2d at 383. The answer is undoubtedly yes. We agree with the State that Indiana's firearm prohibition is aligned with the federal GCA. And as the United States Supreme Court has explained, one of the underlying purposes of the act was to "close [a] dangerous loophole" namely, "[e]xisting felon-in-possession laws, Congress recognized, were not keeping firearms out of the hands of domestic abusers, because 'many people who engage in

10

serious spousal or child abuse ultimately are not charged with or convicted of felonies.'" U.S. v. Hayes, 555 U.S. 415, 426 (2009) (internal citations omitted). And keeping firearms out of the hands of such persons most certainly advances public safety—a legitimate regulatory purpose. See Scarborough v. United States, 431 U.S. 563, 572 (1977) (discussing legislative history of the federal GCA and declaring, "Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." (internal quotation omitted)). This factor leans in favor of treating the statute as non-punitive.

### 7. Excessiveness in Relation to Alternative Purpose

Finally, we determine "whether [the sanction] appears excessive in relation to the alternative purpose assigned . . . ." Mendoza-Martinez, 372 U.S. at 169. Stated somewhat differently the question is whether the non-punitive regulatory purpose is excessive in this case.

To be sure there is a rational connection to a non-punitive purpose—public safety by keeping firearms out of the hands of domestic abusers. However the domestic violence determination with its corollary firearm prohibition does not "consider the seriousness of the crime . . . or an initial determination of the risk of re-offending," factors that in a different context we have noted have a bearing on the excessiveness inquiry. See Pollard, 908 N.E.2d at 1153 (reviewing residency restriction statute in connection with its non-punitive purpose—public safety and protection of children). Here the firearm prohibition applies without consideration of whether the offender actually used a firearm or even threatened to use one. Indeed the statute prohibits an offender's ability to possess firearms based on conduct that may have nothing at all to do with firearms.

At first blush it may appear the lack of specificity within the statute could favor treating this factor as slightly punitive. However, there is even more to support the non-punitive nature of this prohibition because the prohibition is not a lifetime ban. After five years a person may

11

petition the court for restoration of his or her right to possess a firearm.  See I.C. § 35-47-4-7.[10] In considering the petition the court is required to take into account a number of factors that are specifically tailored to the offender and focused on the offender's conduct over the course of the five year period.  Id.  This aspect of the statute outweighs any punitive effect that may arise by keeping firearms out of the hands of individuals who have engaged in domestic violence, which rarely arises as an isolated incident and is prone to escalate in severity.  We conclude therefore this factor leans slightly in favor of treating the statute as non-punitive.

In summary, of the seven factors identified by Mendoza-Martinez as relevant to the inquiry of whether a statute has a punitive effect, three factors—affirmative disability or restraint, traditional aims of punishment, and application to criminal behavior—point in favor of treating the effect of the firearm prohibition statute as punitive.  The remaining factors, particularly factor seven—excessiveness—point in the other direction.  As we indicated earlier although "no one factor is determinative," Wallace, 905 N.E.2d at 379, we nonetheless give "greatest weight" to factor seven, Pollard, 908 N.E.2d at 1153, and "our task is not simply to count the factors on each side, but to weigh them."  Wallace, 905 N.E.2d at 379 (citation omitted).  After weighing these factors we conclude the firearm prohibition statute is non-punitive.  But even if the balancing of these factors indicated that statute was slightly punitive, the statute is not *so* punitive in effect that we can say with certainty the statute negates our assumption the legislature intended to create a civil, non-punitive regulatory regime.

---

[10] "Not earlier than five (5) years after the date of conviction, a person who has been convicted of a crime of domestic violence may petition the court for restoration of the person's right to possess a firearm. . . [T]the court shall consider the following factors:
    (1) Whether the person has been subject to:
        (A) a protective order;
        (B) a no contact order;
        (C) a workplace violence restraining order; or
        (D) any other court order that prohibits the person from possessing a firearm.
    (2) Whether the person has successfully completed a substance abuse program, if applicable.
    (3) Whether the person has successfully completed a parenting class, if applicable.
    (4) Whether the person still presents a threat to the victim of the crime.
    (5) Whether there is any other reason why the person should not possess a firearm, including whether the person failed to satisfy a specified condition under subsection (c) or whether the person has committed a subsequent offense."

I.C. § 35-47-4-7(b) (2012).

We are aided in this disposition by our long-held declaration that "every statute stands before us clothed with the presumption of constitutionality until that presumption is clearly overcome by a contrary showing." Jensen, 905 N.E.2d at 390 (citing State v. Rendleman, 603 N.E.2d 1333, 1334 (Ind. 1992)). Further, "[i]f two reasonable interpretations of a statute are available, one of which is constitutional and the other not, we will choose that path which permits upholding the statute because we will not presume that the legislature violated the constitution unless the unambiguous language of the statute requires that conclusion." Id. at 390-91 (quoting State Bd. of Tax Comm'rs v. Town of St. John, 702 N.E.2d 1034, 1037 (Ind. 1998)). In essence Hitch has failed to carry his burden of proof. There was no error here let alone fundamental error.

**IV.**

Hitch contends even if the Court finds there is no fundamental error, the evidence nonetheless does not show he committed a crime of domestic violence. In pertinent part, a crime of domestic violence includes "use of physical force . . . against a . . . person who was cohabitating with or had cohabitated with the defendant as a spouse . . . ." I.C. § 35-31.5-2-78 (2012); see also supra at n.9. According to Hitch the facts in this case are analogous to those in Johnson v. State, 903 N.E.2d 472 (Ind. Ct. App. 2009). In Johnson the trial court's domestic violence determination was reversed on appeal because the evidence revealed the parties had been living together "only two or three months when the battery occurred" and that the victim moved in with the defendant "as a convenience because she lost her apartment." Id. at 476. Here Hitch points out that like the victim in Johnson Bruce lived with him out of convenience while she waited for her apartment to be ready. He also directs our attention to portions of the trial transcript in which Bruce testified the arrangement was "temporary" and that she kept her belongings packed in bags because she was "planning on leaving soon[.]" Br. of Appellant at 9 (quoting Tr. at 98, 96). According to Hitch "there was no testimony Bruce and Hitch were intimate while she stayed at his apartment." Id. at 10.

Because Hitch appeals a judgment entered by the trial court without a jury we employ a clearly erroneous standard of review. See Ind. Trial Rule 52(A).[11] Under this standard we review only for sufficiency of the evidence. State v. Oney, 993 N.E.2d 157, 161 (Ind. 2013). "We neither reweigh the evidence nor determine the credibility of witnesses." Id. "We consider only the probative evidence and reasonable inferences supporting the judgment and reverse only on a showing of clear error." Id. Clear error is "that which leaves us with a definite and firm conviction that a mistake has been made." Id. (citation omitted).

The facts in this case are distinguishable from those in Johnson, most notably the duration of the relationship. Unlike Johnson, here the parties had been living together not for two or three months but for several months—January to August. Hitch does not contest this point. And Bruce testified Hitch was her ex-boyfriend with the relationship ending the night he assaulted her. When asked if the couple were involved in a "romantic relationship," Hitch began testifying about the months leading up to and including the day of the argument. See Tr. at 163-65. The reasonable inference from this testimony is that for eight months the couple lived together in a romantic relationship but they did not do so for the few weeks leading up to the argument.

The statute makes clear domestic violence includes a person who "was cohabitating with or *had cohabitated* with the defendant as a spouse . . . ." I.C. § 35-31.5-2-78(2)(C) (emphasis added). Therefore, regardless of whether the second cohabitation was romantic the parties' first romantic cohabitation satisfies the statutory mandate. Thus, the evidence was sufficient to sustain the trial court's domestic violence determination and thus its judgment was not clearly erroneous.

---

[11] The rule provides in pertinent part: "On appeal of claims tried by the court without a jury or with an advisory jury, at law or in equity, the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

## Conclusion

We affirm the judgment of the trial court.

Rush, C.J., and David, J., concur.
Massa, J., concurs in result with separate opinion in which Dickson, J., joins.

**Massa, J., concurring in result with separate opinion.**

I agree with the holding of the Court today, that the loss of firearm privileges which accompanies a "crime of domestic violence" determination by a trial judge at sentencing does not violate Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), and its progeny. I do not, however, concur in the Court's rationale, because I believe it begins a slow march in the wrong direction.

We have previously confronted the loss of constitutional rights incident to a criminal conviction, and determined that such a loss is merely a "collateral consequence" of conviction, rather than a distinct criminal punishment. See, e.g., Snyder v. King, 958 N.E.2d 764, 785 (Ind. 2011) ("[T]he General Assembly may exercise its police power to deprive all convicted prisoners of the right to vote for the duration of their incarceration. . . . The loss of political and civil rights upon conviction and imprisonment is simply a collateral consequence thereof."); Williams v. State, 641 N.E.2d 44, 46 (Ind. Ct. App. 1994) ("Collateral consequences attending a guilty plea in some circumstances . . . may include the loss of civil service employment, of the right to vote and to travel freely abroad, of the right to a driver's license, and of the right to possess firearms." (internal citations omitted)). This is consistent with Supreme Court precedent, holding that the disenfranchisement of convicted felons (both during incarceration and after release) is not punitive, or otherwise violative of the Fourteenth Amendment. See Richardson v. Ramirez, 418 U.S. 24, 56 (1974) (holding that California could permissibly "exclude from the franchise convicted felons who have completed their sentences and paroles" under the Fourteenth Amendment); Trop v. Dulles, 356 U.S. 86, 96–97 (1958) ("A person who commits a bank robbery . . . loses his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise.")

And what's more, *none* of this body of precedent relied upon the federal test for whether a government restriction is "punitive" rather than "regulatory" under the United States

Constitution.  See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168–69 (1963).  Indeed, federal law holds that its virtually-identical firearm restriction—18 U.S.C. § 922(g)(9) (2012)[12]—is *not* a criminal penalty, without relying on the seven-factor Mendoza-Martinez test.  In Lewis v. United States, the Supreme Court considered a challenge to 18 U.S.C. App. § 1202(a)(1),[13] which prohibited a convicted felon from possessing a firearm.  445 U.S. 55, 57–58 (1980).  Lewis pled guilty of felony breaking and entering in 1961, was subsequently charged with violating § 1202(a)(1), and defended on the grounds that the original conviction was invalid.  Id.  The Supreme Court affirmed the charge, using the following rationale:

> Congress' judgment that a convicted felon, even one whose conviction was allegedly uncounseled, is among the class of persons who should be disabled from dealing in or possessing firearms because of potential dangerousness is rational.  *Enforcement of that essentially civil disability through a criminal sanction does not support guilt or enhance punishment*, on the basis of a conviction that is unreliable when one considers Congress' broad purpose.

Id. at 67 (emphasis added) (internal quotations omitted).[14]  More recently, the Ninth Circuit found that the holding in Lewis applies with equal force to 18 U.S.C. § 922(g)(9), finding that it too is a "civil disability."  United States v. First, 731 F.3d 998, 1008–09 (9th Cir. 2013), cert. denied, 135 S. Ct. 50 (2014).  And like Lewis, the Ninth Circuit in First did not resort to the Mendoza-Martinez test to reach this outcome.

I therefore believe that applying the Mendoza-Martinez test to this Apprendi-based constitutional challenge injects unnecessary ambiguity into the court's decision-making process

---

[12] This federal counterpart reads:  "It shall be unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition . . . ."

[13] The specific statute in Lewis, codified in the Appendix to Title 18 as part of the Omnibus Crime Control and Safe Streets Act of 1968, was repealed in 1986.  See Pub. L. 99-308, § 104(b), 100 Stat. 459.  "The substance of this provision is now contained in § 922(g)(1)."  United States v. Bena, 664 F.3d 1180, 1186 (8th Cir. 2011).

[14] The Lewis majority then referred to § 1202(a)(1) as "a civil firearms disability," and even noted in dicta that its reasoning should apply to 18 U.S.C. § 922 as well.  See Lewis, 445 U.S. at 63–64, 67.

at sentencing.  Criminal conviction in Indiana carries with it a number of "collateral consequences" not directly related to the criminal sentence, including, but not limited to:

- Disenfranchisement for the term of incarceration, Ind. Code § 3-7-13-4 (2005);

- Ineligibility for jury service during the term of disenfranchisement, Ind. Code § 33-28-5-18(b)(5) (2008);

- The requirement to provide both fingerprints, Ind. Code § 35-38-1-28 (2014), and DNA samples to the State, Ind. Code § 10-13-6-10 (2010); Ind. Code § 35-38-1-27 (2014);

- A court order prohibiting contact with an individual, Ind. Code § 35-38-1-30 (2014);

- Seizure of monies earned while incarcerated as a result of the criminal conduct, Ind. Code § 5-2-6.3-3 (2010);

- Depending on the crime, registration as a credit restricted felon, Ind. Code § 35-38-1-7.8 (2014), or a habitual offender, Ind. Code § 35-38-1-32 (2014), loss of driver's license, Ind. Code § 35-48-4-15 (2014), and mandatory HIV testing, which if positive is disclosed to the defendant's victims, Ind. Code § 35-38-1-10.5, -10.6 (2014);

- For certain gambling-related offenses, lifetime prohibitions on running or even entering a gambling establishment, Ind. Code § 4-33-10-4 (2012); Ind. Code § 4-35-6.5-3 (2012); and

- Eligibility for certain *rehabilitative* government assistance programs, such as Temporary Assistance for Needy Families funding, Ind. Code § 12-14-28-3.3 (2012), and substance abuse clinics.  Ind. Code § 5-2-11-0.5, -5 (2010).

All of these consequences involve at least a minimal finding of fact by the sentencing court, some of which may not have been found by the jury beyond a reasonable doubt.  Moreover, several of these restrictions implicate constitutional rights, such as the right to vote, the right to serve on a jury, privacy rights, freedom of association and freedom to travel.  I do not believe that each and every one of these consequences need be subjected to the Mendoza-Martinez test in future litigation asserting a Blakely/Apprendi claim.  Rather, this Court should endeavor to

3

keep that Pandora's Box closed,[15] and continue to entrust our trial courts to operate with appropriate discretion at sentencing in ordering such "collateral consequences" be applied.

For the foregoing reasons, I concur in today's result, affirming the trial court's "crime of domestic violence" determination under Indiana Code section 35-38-1-7.7.

Dickson, J., joins.

---

[15] We first adopted the federal intent-effects test in Wallace v. State, where we held that Indiana's sex offender registration requirement constituted a criminal punishment, and thus could not be imposed on Wallace under the Ex Post Facto Clause of the Indiana Constitution, since he had already committed his crime and even completed his Indiana sentence before the law was enacted. 905 N.E.2d 371, 379–84 (Ind. 2009). And we did this despite acknowledging that the United States Supreme Court had found a similar registration requirement non-punitive—applying this same test under the Ex Post Facto Clause of the United States Constitution. Id. at 378 (citing Smith v. Doe, 538 U.S. 84, 105–06 (2003)). This outcome makes Indiana an outlier, as the vast majority of our sister state courts which have addressed the issue have found their sex offender registration requirements to be non-punitive, in line with Smith. See Tyson v. State, -- N.E.3d --, 2016 WL 756366, at n.2 (Ind. Feb. 25, 2016) (noting at least ten states which have upheld sex offender registry requirements as non-punitive). And to further complicate matters, on the same day this Court handed down Wallace, it also handed down Jensen v. State, where a plurality reached the opposite outcome and found application of sex offender registry requirements to Jensen did not offend the Indiana Constitution. 905 N.E.2d 384 (Ind. 2009).

Because Wallace and Jensen made it abundantly clear that sex offender registry requirements must be tested on a case-by-case as-applied basis, they have invited an endless string of appeals from sex offenders who want to avoid telling their neighbors that they live next door, with varying results. See, e.g., Tyson, 2016 WL 756366 (non-punitive); State v. Zerbe, -- N.E.3d --, 2016 WL 756368 (Ind. Feb. 25, 2016) (non-punitive); Gonzalez v. State, 980 N.E.2d 312 (Ind. 2013) (punitive); Lemmon v. Harris, 949 N.E.2d 803 (Ind. 2011) (non-punitive); Hevner v. State, 919 N.E.2d 109 (Ind. 2010) (punitive); State v. Pollard, 908 N.E.2d 1145 (Ind. 2009) (punitive). And we have declined to review many more such decisions by our Court of Appeals. See, e.g., Seales v. State, 4 N.E.3d 821 (Ind. Ct. App.) (non-punitive), trans. denied, 9 N.E.3d 170 (Ind. 2014); State v. Hough, 978 N.E.2d 505 (Ind. Ct. App. 2012) (punitive), trans. denied, 985 N.E.2d 339 (Ind. 2013); Andrews v. State, 978 N.E.2d 494 (Ind. Ct. App. 2012) (punitive), trans. denied, 985 N.E.2d 339 (Ind. 2013); Burton v. State, 977 N.E.2d 1004 (Ind. Ct. App. 2012) (punitive), trans. denied, 985 N.E.2d 339 (Ind. 2013), abrogated by Zerbe, 2016 WL 756368; Healey v. State, 969 N.E.2d 607 (Ind. Ct. App.) (non-punitive), trans. denied, 974 N.E.2d 475 (Ind. 2012). Parsing through these seven factors has proven to effectively grant us near total discretion to follow our gut instinct as to whether a restriction "feels" like punishment.

But having said that, although a majority of this Court has recently taken a more casual attitude toward stare decisis, see Myers v. Crouse-Hinds Div. of Cooper Indus., Inc., -- N.E.3d --, 2016 WL 825111 (Ind. Mar. 2, 2016), the doctrine nonetheless compels continued application of the intent-effects test in sex offender registry appeals. I would prefer, however, that we not get tangled in the same briar patch when reviewing a host of other consequences collateral to conviction.